IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

| | | |
|---|---|---|
| LEAPERS, INC.<br>(A Michigan Corporation), | § | |
| | § | CIVIL ACTION |
| Plaintiff | § | |
| | § | NO. 2:14-cv-12290-RHC-DRG |
| v. | § | |
| | § | Judge Robert H. Cleland |
| SMTS, LLC d/b/a TUFF ZONE | § | |
| (A Michigan Corporation);<br>TRARMS, INC. | § | Magistrate Judge David R. Grand |
| (A California Corporation); and | § | |
| SUN OPTICS USA, | § | **JURY DEMAND** |
| (A Texas Corporation), | § | |
| | § | **[FILED UNDER SEAL]** |
| Defendants | § | |

─────────────────────────────

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

─────────────────────────────

Joseph F. Cleveland, Jr.
BRACKETT & ELLIS, P.C.
100 Main Street
Fort Worth, Texas  76102-3090

James K. Thome
VANDEVEER GARZIA, PC
1450 Long Lake Road, Suite 100
Troy, Michigan  48098

ATTORNEYS FOR DEFENDANT
SUN OPTICS USA

Douglas P. LaLone
Barbara L. Mandell
Melissa R. Atherton
FISHMAN STEWART YAMAGUCHI,
PLLC
39533 Woodward Ave., Suite 240
Bloomfield Hills, MI 48304

ATTORNEYS FOR DEFENDANTS
SMTS, LLC d/b/a TUFF ZONE,
TRARMS, INC., and COUNTER-
PLAINTIFF CHUANWEN SHI

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION .......................................................................................... 1

STATEMENT OF MATERIAL FACTS .................................................. 5

BRIEF ............................................................................................................... 8

I.  ISSUES PRESENTED ........................................................................... 8

II.  STATEMENT OF CONTROLLING OR MOST APPROPRIATE
AUTHORITY .......................................................................................... 9

III. STANDARD OF REVIEW ................................................................. 10

IV. ARGUMENT AND AUTHORITIES ................................................ 11

A. PLAINTIFF HAS FAILED TO PROVE SECONDARY MEANING AND NON-
FUNCTIONALITY—TWO ESSENTIAL ELEMENTS OF ITS TRADE DRESS
INFRINGEMENT CLAIM ..................................................................... 11

1.  Plaintiff's Trade Dress Has Not Acquired Secondary Meaning ................. 12

a. Plaintiff has not offered any direct consumer testimony
demonstrating its design acquired secondary meaning
before 2004 ................................................................................ 13

b. Direct consumer survey evidence conclusively establishes that
Plaintiff's trade dress has not acquired secondary meaning ............. 14

c. The exclusivity, length and manner of use of Plaintiff's
evolving trade dress does not support secondary meaning .............. 17

1.  At least two other companies sold products bearing
virtually identical scalloping design in the United States
before Plaintiff ....................................................................... 17

2.  Plaintiff's use of its trade dress is not exclusive
because many other companies in the United
States sell products bearing scalloping designs
identical or similar to Plaintiff's trade dress ...........................20

3.  Customers cannot associate Plaintiff's trade dress
with a single source because it has been applied
inconsistently ........................................................................22

d.  The amount and manner of Plaintiff's advertising does not
support secondary meaning ..................................................24

e.  The amount of sales and number of customers do not support
secondary meaning of Plaintiff's trade dress ......................27

f.  Plaintiff's place in the market does not support  secondary
meaning ................................................................................28

g.  There is no evidence of intentional copying ......................28

2.  Plaintiff's Trade Dress is Functional ............................................29

B.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
FOR FALSE DESIGNATION OF ORIGIN OR SPONSORSHIP .......................35

C.  PLAINTIFF'S CLAIMS FOR COMMON LAW TRADEMARK INFRINGEMENT, UNFAIR
COMPETITION, VIOLATION OF M.C.L.A § 429.42, AND VIOLATION OF THE
MICHIGAN CONSUMER PROTECTION ACT, M.C.L.A. § 445.903(1) ARE ALL
GOVERNED BY THE SAME STANDARDS AS PLAINTIFF'S LANHAM ACT CLAIMS
AND THEREFORE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
THESE CLAIMS ..............................................................................37

D.  THIS COURT SHOULD ORDER THAT PLAINTIFF'S MICHIGAN AND CALIFORNIA
REGISTRATIONS FOR ITS TRADE DRESS BE CANCELLED. ......................38

V.  CONCLUSION ...........................................................................38

CERTIFICATE OF SERVICE ...........................................................40

ii

# TABLE OF AUTHORITIES

## Cases

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir. 2002) ..............................................................16

*Alfred Dunhill, Ltd. v. Interstate Cigar Co.,* 499 F.2d 232 (2nd Cir. 1974)..................................................................................35

*Antioch Co. v. Western Trimming Corp.,* 347 F.3d 150 (6th Cir. 2003) .... 11, 30, 31

*Ashland Oil, Inc. v. Olymco, Inc.,* 1995 WL 499466 (6th Cir. 1995) .....................14

*Carlton-Sud Indus., LLC v. The Plastics Grp., Inc.,* No. 03-CV-74725-DT, 2004 WL 2812430 (E.D. Mich. 2004)........................................................ 11, 12

*Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831 (6th Cir. 1983).......37

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................10

*Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23 (2003)........ 35, 36

*DeGidio v. West Group Corp.,* 355 F.3d 506 (6th Cir. 2004) ................................12

*Empire Nat. Bank of Traverse City v. Empire of America FSA*, 559 F.Supp. 650 (W.D.Mich.1983)..................................................................................37

*Federal–Mogul–Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir. 1963).......36

*Frish's Restaurants, Inc. v. Elby's Big Box*, 670 F.2d 642 (1982)........................36

*Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*, 461 F.3d 675 (6th Cir. 2006).....31

*Gen. Motors Corp. v. Lanard Toys, Inc.,* 468 F.3d 405 (6th Cir. 2006) .... 12, 14, 28

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494 (6th Cir. 2013)...................................................................................... 11, 30

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298 (6th Cir. 2001) ..................................................................................14

*Johnson v. Jones,* 149 F.3d 494 (6th Cir. 1998) .....................................................36

*LeeLanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504
  (6th Cir. 2007)................................................................................37

*Redding v. St. Eward*, 241 F.3d 530 (6th Cir. 2001) ................................10

*T.D.C. Intern Corp. v. EZ Movers, Inc.,* 2014 WL 10988 (E.D. Mich. 2014) ........37

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001)........... 29, 30

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205 (2000) ........................12

**Rules**

15 U.S.C. § 1051 ....................................................................................11

15 U.S.C. § 1125(a)(3)............................................................................29

15 U.S.C. §1125(a) ................................................................................35

Cal. Bus. and Professions Code § 14230 ................................................38

Fed. R. Civ. P. 30(b)(6)..........................................................................13

Fed. R. Civ. P. 56(a)..............................................................................10

M.C.L.A § 492.42 ..................................................................................38

M.C.L.A. § 429.38 ................................................................................38

M.C.L.A. § 445.903(1) ..........................................................................38

**Other Authorities**

Diamond, S.S. and Swann, J.B. (Eds.), TRADEMARK AND DECEPTIVE
  ADVERTISING SURVEYS, American Bar Association 311 (2012)..........................14

## INTRODUCTION

Defendants Sun Optics USA ("Sun Optics"), SMTS, LLC d/b/a Tuff Zone ("SMTS"), Trarms, Inc. ("Trarms"), and Counter-Plaintiff Chuanwen Shi ("Shi") (collectively "Defendants") move for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the remaining claims filed by Plaintiff Leapers, Inc. ("Plaintiff") for (1) trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1051, et seq., (2) false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. §1125(a), (3) common law trademark infringement, (4) unfair competition, (5) violation of M.C.L.A § 492.42, and (6) violation of the Michigan Consumer Protection Act, M.C.L.A. § 445.903(1).[1]

On April 16, 2015, Defendants' counsel communicated with Plaintiff's counsel, Brian Wassom, to seek concurrence on this motion. The basis of the motion was set forth in detail as well as the relief that was requested.   Concurrence was not obtained; therefore, this motion is necessary.   Thus, LR 7.1 has been satisfied.

All of Plaintiff's claims purport to enforce common law trade dress rights in the product configuration of a rifle scope consisting of "smooth and continuous wave-like scalloping" . . . "applied to the adjustment knobs and bells of its scopes."

---

[1] On October 3, 2014, this Court dismissed with prejudice Plaintiff's trademark dilution claim under 15 U.S.C. §1125(c). (Dkt. # 26)

1

(Dkt. #36, Pg. ID 516).  In particular, Plaintiff claims it owns "scallops on a scope" at any location where the parts of the scope can be adjusted.  *Id.*

The United States Patent and Trademark Office, however, has flat out refused to register Plaintiff's trade dress because Plaintiff's, design is functional and has acquired no secondary meaning.  APP 1438-45, 1834-39.[2]

Plaintiff's asserted "scallop" design cannot serve as a single-source designation because it has continually "evolved" since 2002 into other shapes and configurations.  APP 950-55, 971-79, 290-91, 288-89, 292, 363, 289.1-289.3, 360-65, 543-54, 565-66, 284-85, 10, 14, 29.  The "scallops" not only have mutated into different shapes and sizes, they have not been uniformly applied to all products.  *Id*.  Moreover, Plaintiff's own former employees testified that when they worked for Plaintiff from 2002-2011, Plaintiff never claimed it owned the "scallops on a scope" design, never told the employees about this alleged trade dress, and that none of Plaintiff's advertising to customers ever pointed to or informed customers that any rights were claimed in "scallops on a scope."  APP 1790, 1794, 1797, 647-48, 651-52, 321-322.1, 342, 323-324.1, 335.1-337, 327-30, 501-27, 528-602.  In fact, to date, none of Plaintiff's advertising has ever been directed to this alleged "scallops on a scope" mark Plaintiff claims Defendants have infringed.  *Id.*

---

[2] For brevity, all references in Defendants' brief in support of their motion for summary judgment will be designated by "APP" followed by the specific page number where the evidence supporting Defendants' assertion may be found in Defendants' appendix in support of their brief.

The reality is Plaintiff concocted this alleged common law trade dress claim solely to create an anti-competitive barrier in the rifle scope market. In a nutshell, Plaintiff has failed to show that its trade dress has acquired any secondary meaning. APP 1684, 744-46, 747-49, 760, 763-66. Indeed, a significant segment of potential consumers considers Plaintiff's product design to be generic and non-distinctive. APP 1684.

Plaintiff also cannot prove that its trade dress lacks functionality. It's obvious that the scalloping applied to the adjustment knobs and bells permits hunters to grip and turn them effectively in inclement weather conditions or even while wearing gloves and therefore serves an essential purpose for the use and operation of the rifle scope. APP 1215, 624-27, 634, 1310-13, 1798-99, 1802, 1804.

Defendants have never passed off Plaintiff's products as their own, nor have they passed off their own products as having come from Plaintiff. APP 331-33, 348, 638-41, 1315-16. As such, Plaintiff's claim for false designation of origin utterly fails.

Plaintiff's remaining claims under Michigan state law should be dismissed because they are governed by the same standards as its claim for trade dress infringement under the Lanham Act.

For the reasons stated, Defendants respectfully request that this Court grant Defendants' motion for summary judgment and dismiss with prejudice all of Plaintiff's claims.

## STATEMENT OF MATERIAL FACTS

1.      Plaintiff was founded in 1992 by Tina and David Ding.  APP 270-71. Plaintiff sells rifle scopes for rifles, air rifles and other shooting instruments.  APP 272-73.  Since 2000, Plaintiff has expanded into other product categories, including mounting systems and other hunting accessories.  *Id*.  Plaintiff does not directly sell rifle scopes to the consuming public.  APP 318.  Instead, consumers purchase Plaintiff's scopes from distributors or dealers that carry its products.  *Id*. Plaintiff currently sells its rifle scopes under the UTG and ACCUSHOT brands. APP 320.

2.      In a stipulation filed with the Court, Plaintiff defines its trade dress as "smooth and continuous wave-like scalloping having uniform and proportional peaks and valleys extending in straight, parallel, uniform and unbroken lines . . . on all surfaces where an adjustment can be made on the scope."  (Dkt. # 36, Pg. ID 516).  Plaintiff's alleged trade dress is illustrated in the figures below.  *Id*.  The solid lines in the line drawing depict Plaintiff's asserted trade dress.



Dkt. #36, Pg. ID 521-22.

3.     According to Plaintiff, the scalloping design does not have to appear on all locations of the scope but only on applicable components, such as the objective bell, turrets, power ring and diopter.  APP 276.1, 277-79, 280-82, 295. Contrary to Leapers' stipulation, Leapers' corporate representative testified that the scalloping design need not be on all four areas of the scope; instead, it claims trade dress protection where the scalloping design is applied to one or more of the adjustable components of each scope model.  Compare Dkt. #36, Pg. ID 516 with APP 286-87.

4.     Plaintiff claims that its trade dress was first used in commerce on February 20, 2003.  APP 358.1-358.2.  Plaintiff does not own a federal trademark registration for its trade dress. APP 343.  In fact, the above drawing is from the United States Patent and Trademark Office filing by Plaintiff and the status of application Serial No. 86251178 is that the Office has refused registration twice. APP 1438-45, 1834-39.

5.     B Square, a third party scope distributor, first sold rifle scope model CSP26, one of the accused scopes, in 2004.  APP 1302.  Sun Optics later began carrying that same model under the SUN OPTICS brand in 2007. *Id.*  Sun Optics first sold the accused SUN OPTICS rifle scope model CS24 in 2012 and first sold the accused SUN OPTICS rifle scope model CS87 in 2013.  APP 1303, 1314.

SMTS first began sourcing the accused SNIPER rifle scope in 2011 from Trarms.

APP 643.

## BRIEF

## I.    ISSUES PRESENTED

ISSUE ONE:      Whether Plaintiff proved its trade dress acquired secondary meaning in the relevant market, an essential element of its trade dress infringement claim?

                  ANSWER:  NO

ISSUE TWO:      Whether Plaintiff proved that its trade dress was non-functional, an essential element of its trade dress infringement claim?

                  ANSWER:  NO

ISSUE THREE:    Whether Plaintiff proved that the Defendants falsely designated the origin of their products, an essential element of its false designation of origin claim?

                  ANSWER:  NO

ISSUE FOUR:     Given that Plaintiff's claims for common law trademark infringement, unfair competition, violation of M.C.L.A § 492.42, and violation of the Michigan Consumer Protection Act, M.C.L.A. § 445.903(1), are governed by the same standards as Plaintiff's claim for trade dress infringement under the Lanham Act, whether Plaintiff proved these claims as a matter of law?

                  ANSWER:  NO

## II.   STATEMENT OF CONTROLLING OR
## MOST APPROPRIATE AUTHORITY

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*,
    280 F.3d 619 (6th Cir. 2002)

*Antioch Co. v. Western Trimming Corp.*,
    347 F.3d 150 (6th Cir. 2003)

*Ashland Oil Inc. v. Olymco, Inc.*,
    1995 WL 499466 (6th Cir. 1995)

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
    871 F.2d 590 (6th Cir. 1989)

*Carson v. Here's Johnny Portable Toilets, Inc.*,
    698 F.2d 831 (6th Cir. 1983)

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)

*Frish's Restaurants, Inc. v. Elby's Big Box*,
    670 F.2d 642 (1982)

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
    468 F.3d 405 (6th Cir. 2006)

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    730 F.3d 494 (6th Cir. 2013)

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
    270 F.3d 298 (6th Cir. 2001)

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23 (2001)

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000)

### III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) allows for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  A defendant moving for summary judgment may satisfy the burden of proving that the plaintiff has failed to meet an essential element of its claim either by providing evidence that negates the existence of an essential element of that claim or by showing there is no evidence to support an essential element of plaintiff's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).

The evidence shows that Plaintiff failed to meet essential elements on all of its claims.  Defendants are therefore entitled to summary judgment on Plaintiff's claims as a matter of law.

# IV.   ARGUMENT AND AUTHORITIES

## A. PLAINTIFF HAS FAILED TO PROVE SECONDARY MEANING AND NON-FUNCTIONALITY—TWO ESSENTIAL ELEMENTS OF ITS TRADE DRESS INFRINGEMENT CLAIM.

To succeed in a claim for infringement of unregistered trade dress under § 43(a) of the Lanham Act, 15 U.S.C. § 1051, et seq., a plaintiff must establish three elements: "(1) that its alleged appropriated trade dress has acquired secondary meaning to the relevant public; (2) that its alleged trade dress is non-functional; and (3) that there is a likelihood of confusion on the part of consumers as to the source of the product." *Carlton-Sud Indus., LLC v. The Plastics Grp., Inc.,* No. 03-CV-74725-DT, 2004 WL 2812430 at *2 (E.D. Mich. 2004) (Cleland, J.) (citing *Antioch Co. v. Western Trimming Corp.,* 347 F.3d 150, 154 (6th Cir. 2003)). "If the plaintiff fails to present sufficient evidence for a reasonable jury to find in its favor on any one of these three elements, then judgment as a matter of law should be entered for the defendant." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 504 (6th Cir. 2013). Because Plaintiff cannot meet elements one and two of this test, Defendants are entitled to summary judgment on Plaintiff's trade dress infringement claim as a matter of law.[3]

---

[3] Due to this strong evidence of lack of secondary meaning and non-functionality, Defendants are not seeking summary judgment on element three—likelihood of confusion or ownership, but reserve the right to do so at some later time.

### 1.    Plaintiff's Trade Dress Has Not Acquired Secondary Meaning.

Plaintiff is seeking trade dress protection for the design of its product—a rifle scope having scallops on the adjustable components of the scope. Trade dress based on product design is protectable only if the design has acquired secondary meaning. *See Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205 (2000). "Secondary meaning ordinarily exists when 'the attitude of the consuming public toward the [trade dress] denotes a single thing coming from a single source.'" *Carlton-Sud,* 2004 WL 2812430 at *2 (citing *DeGidio v. West Group Corp.,* 355 F.3d 506, 513 (6th Cir. 2004)).

Evidentiary factors considered in evaluating secondary meaning include: "(1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Gen. Motors Corp. v. Lanard Toys, Inc*., 468 F.3d 405, 418 (6th Cir. 2006).  Plaintiff bears the burden of proving secondary meaning. *Id*. "The evidentiary burden necessary to establish secondary meaning is substantial." *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989).

**a.  Plaintiff has not offered any direct consumer testimony demonstrating its design acquired secondary meaning before 2004.**

"Secondary meaning must be established prior to other's first use of a similar [design]." *Burke,* 871 F.2d at 596.  In this case, Plaintiff must prove that its rifle scope design acquired secondary meaning before 2004, the year in which B Square, a third party scope distributor, first sold rifle scope model CSP26, one of the accused scopes.  APP 1302.  Sun Optics later began carrying that same model under the SUN OPTICS brand in 2007.  *Id.*  Sun Optics first sold the accused SUN OPTICS rifle scope model CS24 in 2012 and first sold the accused SUN OPTICS rifle scope model CS87 in 2013.  APP 1303, 1314.  SMTS first began sourcing the accused SNIPER rifle scope in 2011 from Trarms.  APP 643.

There is, however, no direct consumer testimony demonstrating that Plaintiff's trade dress acquired secondary meaning before 2004.   In fact, Plaintiff's Rule 30(b)(6) witness was unable to identify a date upon which its trade dress acquired secondary meaning. APP 340.  Moreover, Plaintiff's discovery responses confirmed it cannot identify a date upon which its trade dress acquired secondary meaning.  APP 1759.  This factor weighs against a finding of secondary meaning.

### b.    Direct consumer survey evidence conclusively establishes that Plaintiff's trade dress has not acquired secondary meaning.

The Sixth Circuit has "historically favored the use of consumer surveys as proof of secondary meaning." *Gen. Motors Corp.,* 468 F.3d at 419 (noting the court's "strong support for survey evidence in evaluating secondary meaning"); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 298, 312 (6th Cir. 2001) (holding that "survey evidence is the most direct and persuasive evidence available on issues of secondary meaning").

According to the Sixth Circuit, a 50% response rate for single-source recognition in a consumer survey is "generally acceptable for secondary meaning and 38% is marginal recognition." *Gen. Motors Corp,* 468 F.3d at 419 (citing *Ashland Oil, Inc. v. Olymco, Inc.,* 1995 WL 499466 (6th Cir. 1995)).  In *Ashland*, however, the Sixth Circuit found that a 26% response rate was "not sufficiently probative to [a] mark's having secondary meaning . . . ."  1995 WL 499466 at *3-4.  Other courts, like the Sixth Circuit, have likewise refused to find secondary meaning based on survey percentages in the 10-20% range.  Gerald L. Ford, *Survey percentages in Lanham Act Matters,* TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS, S.S. Diamond and J.B. Swann (Eds.) American Bar Association. 311, 317 (2012) (collecting cases) (included in Defendants' Appendix of Cases).

In this case, Defendants' expert, Thomas O. Jukam, Ph.D., conducted a survey to test for acquired secondary meaning of Plaintiff's alleged trade dress applied to the adjustment knobs and bells of its rifle scopes.    APP 1661-62.  Dr. Jukam's research results revealed that only 12.9 percent of the test sample (53 of 412) indicated only one company was associated with the scope in response to the central question, *"do you associate the look of this rifle scope with only one company, with more than one company, or don't you know?" Id.* When taking into account the control sample, Dr. Jukam's research results show that 14.7 percent of the "control" sample (47 of 319) indicated "only one company" in response to the same question. *Id.* By subtracting the control from the test results, Dr. Jukam calculated the "net" secondary meaning to be zero (12.9% - 14.7% = negative 1.8%, which is equivalent to zero). *Id.*[4] This falls well short of the 38% legal threshold.

Based on his analysis of the empirical results of the secondary meaning survey, Dr. Jukam concluded that the "Plaintiff's design configuration of the knobs and bells of its rifle scopes has <u>not</u> acquired distinctiveness and, therefore,

---

[4] The "net" secondary meaning is calculated by subtracting the results of the control sample from the results of the test sample in the secondary meaning study.  Jacob Jacoby, Trademark Surveys—Designing, Implementing and Evaluating Surveys, at 515 n. 103 (2013) (relating to likelihood of confusion) (included in Defendants' Appendix of Cases).  The purpose of the control sample is to filter out any 'noise' that may distort the true results of the survey.  *Id.* at 515.  The test sample is the statistical level of secondary meaning that is determined from the empirical study of a "test" group of consumers that participate in the survey.  By contrast, a controlled sample is a statistical level of secondary meaning that is derived from the empirical study of a "control" group of consumers that participate in the survey.

Plaintiff's claimed common law  trade dress for "scallops on a scope" does not have a secondary meaning in the minds of the relevant consumers and prospective consumers."  APP 1684. (emphasis in original).  Dr. Jukam also opined  that there was "evidence from the survey results to support the conclusion that a significant segment of the sample considers Plaintiff's product design to be a generic, non-distinctive, and common product." *Id.; see Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,* 280 F.3d 619, 638 (6th Cir. 2002) (holding that a producer should not have a monopoly on generic product designs regarded by the public as the basic form of a particular item).

Plaintiff conducted its own secondary meaning survey—it too supports a finding of no secondary meaning. APP 1700.  Specifically, 1,629 respondents in the survey conducted by Plaintiff's expert were shown Plaintiff's rifle scope, but only 9% answered "yes" to the question "*Do you know who puts out this scope?*" APP 744-46, 747-49.  The remaining 91% of those who participated in the survey did not know who put out the scope or were not sure.  APP 748-49.  Of the respondents who answered "yes" to the question "*do you know who puts out this scope?*," only nine (or .5%) of the respondents positively identified the test scope as a Leapers' scope.  APP 760-61, 894-941, 944.  99.5% of respondents either did not believe Plaintiff manufactured the scope or did not know.  APP 761-62.

16

What's more, when shown the Leapers' scope, the respondents who answered the question identified over 40 different brands of scopes other than Plaintiff. APP 763-64, 894-943. According to Plaintiff's expert, the respondents thought the trade dress came from 40 different sources other than Plaintiff and "had a difficult time naming the correct manufacturer of the scope brand on the design alone." APP 765-66. Plaintiff's own survey expert statistically proved that Plaintiff's alleged "scallops on a scope" mark is generic, and more importantly, it does not come from a single source. On this basis alone, this motion should be granted.

### c.    The exclusivity, length and manner of use of Plaintiff's evolving trade dress does not support secondary meaning.

The Court may also consider indirect evidence of secondary meaning, such as exclusivity, length, and manner of use of Plaintiff's trade dress. Plaintiff's use of its trade dress, however, has never been exclusive nor consistent.

### 1.    At least two other companies sold products bearing virtually identical scalloping design in the United States before Plaintiff.

Rifle scopes with scallops have been around for many years before Plaintiff entered the market. APP 1318-19, 1802-03. Specifically, Bushnell and Tasco were selling rifle scopes with a virtually identical scalloping design in 2001 and 1995, respectively, at least two years before Plaintiff's claimed date of first use. Compare Dkt. # 36-2, Pg. ID 522; APP 358.1-358.2 (Leaper's Rifle Scope) to APP

1015 (Sportsman™ Rifle Scope Model Nos. 72-0412); APP 1012 (Elite® 3200 Rifle Scope Model Nos. 32-4124A, 32-5154M, 32-5155M); APP 1013 (Trophy® Rifle Scope Model Nos. 73-4124, 73-4124M, 73-6184); APP 1014 (Banner Dusk & Dawn® Rifle Scope Model Nos. 71-4124, 71-6185; Scope Chief® Model No. 70-4145A); APP 1011 (Elite® 4200 Rifle Scope Model Nos. 42-3640A, 42-4165M, 42-6242M, 42-6243A, 42-6244A, 42-6244M, 42-8324M); APP 1018, 1020-21 (Sportsman™ Rifle Scope Model No. 72-0412); APP 1244, 1279-81 (Tasco® Model Nos. SS10x42M, SS10x42); APP 965-68; APP 983-1017 (2001 Bushnell Catalogue); APP 1227-1278 (1995 Tasco Catalogue).

| 2001 Bushnell Sportsman ™ Rifle Scope Model No. 72-0412 (APP 1015, 1018, 1020-21) | Leapers Rifle Scope Model No. SCP-U6245AORGW (Dkt. #36-2, Pg. ID 522) |
|---|---|
|  | |





| Tasco® Rifle Scope<br>Model No. SS10x42<br>(APP 1224, 1279-81) | Leapers Rifle Scope<br>Model No. SCP-U6245AORGW<br>(Dkt. #36-2, Pg. ID 522) |
| --- | --- |

According to Defendants' firearm expert, Emanuel Kapelsohn, the scalloping design on the objective lens of the Bushnell rifle scope was "virtually identical" to the Leapers' scope "except one [has] a gloss finish and the other has a matte finish."   APP 967.   After carefully examining and comparing the design

details of the Leapers, Bushnell, and Tasco rifle scopes, Kapelsohn concluded that the scope designs were "extremely similar." APP 967, 969-71. Plaintiff's firearm expert, Peter Kokalis, likewise testified that the Leapers and Tasco rifle scopes were copies of the same design. APP 1406-07; 1419. As such, Plaintiff copied the Tasco design and are not the originators of the asserted trade dress.

> ### 2.    Plaintiff's use of its trade dress is not exclusive because many other companies in the United States sell products bearing scalloping designs identical or similar to Plaintiff's trade dress.

In addition to not being the first company to apply scallops to rifle scopes, Plaintiff's vice president, David Ding, testified that "a lot of scopes" have a scalloped-shaped design consisting of a series of arches going around the circumference of a structure.   APP 24.1. Many prominent companies such as Barska, Leupold, BSA, Bushnell, Burris, Cabela's, Lucid, Sightmark, Simmons, Mueller, Brunton, Redfield, Meopta, Steiner, and Tasco all sell scopes bearing scalloping designs similar to Plaintiff's trade dress.   APP 366-424.   Moreover, Plaintiff's survey expert's results revealed consumers think this design comes from over 40 sources.  APP 765-66; 942-43.

In light of such third-party uses, Plaintiff cannot possibly claim its use of its trade dress is exclusive, weighing against a finding that consumers are able to identify Plaintiff's trade dress with a single source.

Moreover, for the past eight years, Plaintiff sold and continues to sell hundreds of thousands of scopes bearing Plaintiff's identical trade dress but under third party brands, significantly diminishing any secondary meaning its trade dress could have acquired.  Specifically, from 2007 until 2011, Plaintiff manufactured and sold scopes bearing Plaintiff's identical trade dress to a third party distributor called Crosman.    APP 306, 313.    At Crosman's request, Plaintiff applied Crosman's CENTERPOINT brand to Plaintiff's scopes, which were then sold by Crosman.    APP 306-07, 311.    Crosman then sold Plaintiff's rebranded scopes under numerous CENTERPOINT models including, Tac1Extreme, NightStalker TK, Benjamin Super Streak, NightStalker Accessories Kit and Crossbow.    APP 306-11, APP 435-36, 440, 450, 459, 480, 482-83, 486, 488-95.    None of these scopes bear Plaintiff's brands.  APP 311.  And Plaintiff never required Crosman to notify its customers that Plaintiff was the source of these scopes.  APP 312.  In Crosman's catalog, consumers were never told that Crosman's scopes were manufactured by Plaintiff.  APP 311-12; 425-500.  In "good years", Plaintiff sold over 100,000 scopes to Crosman.  APP 313-14.  Even today, Plaintiff continues to sell its rebranded scopes bearing the Plaintiff's trade dress to Eastman, another third party marketer of rifle scopes.  APP 314.  By allowing other companies to use its alleged trade dress, Plaintiff has destroyed  any potential secondary meaning its trade dress has supposedly acquired.

### 3. Customers cannot associate Plaintiff's trade dress with a single source because it has been applied inconsistently.

Not only has Plaintiff allowed others in the market to use its trade dress, Plaintiff has failed to apply its scalloping design consistently to all of the components of its rifle scopes. APP 950-55, 971-79.  For example, according to Plaintiff's corporate representative, the shape of Plaintiff's scalloping design could be different because the diameter of the turret is smaller than the objective bell. APP 282.  The dimensions of the scalloping are different on each component because the scalloping is applied to different components having different sizes and are located on different areas of the scope.  APP 283.  Therefore, "[t]he component itself has some impact on the scallop that is used on each portion of the scope."  APP 281.  Accordingly, the wave-like scalloping is "not exactly the same because they are applied on different components."  APP 280.

Plaintiff also has not consistently applied the trade dress even among its rifle scope models.  APP 950-55, 971-79, 1799-1801, 1806-29.  Recently, Plaintiff began selling "a new line of scope with an updated look."  APP 290-91, 363, 363.1.  In one particular "family of scopes," Plaintiff's trade dress "evolved" from a smooth and continuous wave-like scalloping into an "edgier" 90 degree wave configuration.  APP 288-89.  In so doing, Plaintiff "expanded" how it "traditionally" uses its trade dress and applied a different design to its "new

scope[s] to give [them] a modern look." APP 292. Plaintiff's "edgier" trade dress is representative of its current style in one "family" of rifle scope models. APP 288-89. As illustrated below, Plaintiff's "edgier" trade dress is significantly different from the asserted trade dress in this case. Compare Dkt. #36-2, Pg. ID 522 with APP 363, 361.1, 950-55, 971-79.

| Leapers New "Edgier" Rifle Scope (APP 363, 363.1) | Leapers Rifle Scope Model No. SCP-U6245AORGW (Dkt. #36-2, Pg. ID 522) |
|---|---|
|  | |

Plaintiff's "edgier" configuration has expanded and evolved in that family of scopes and is now one of many models offered by Plaintiff. APP 288-89, 289.1-289.3, 360-65, 543-54, 565-66. According to Plaintiff, "[i]t's an evolutional design based on the trade dress." APP 284-85, 10, 14, 29.

    Plaintiff thus admitted that its trade dress varies depending on the scope model and the location of the scallop design and is constantly evolving. It begs the question: how can Plaintiff claim each rendition of its trade dress has acquired

secondary meaning?  These inconsistencies coupled with the lack of exclusivity in the marketplace all weigh against a finding of secondary meaning.

>       **d.      The amount and manner of advertising for Plaintiff's trade dress does not support secondary meaning.**

The Court may also consider indirect evidence of secondary meaning consisting of the amount and manner of Plaintiff's advertising.  But advertising expenditures that "are required to 'merely survive' in the competitive market" are not sufficient to prove secondary meaning. *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.* 871 F.2d 590, 596 (6th Cir. 1989).  Secondary meaning can only be established through "extensive advertising" resulting in consumer association with a single source." *Id.* Moreover, that secondary meaning must be established *before* Defendants entered the marketplace which is 2004 for the accused Sun Optics scopes.  *Burke*, 871 F.2d at 596.

In *Burke*, the Sixth Circuit found that $100,000 in annual advertising expenditures was insufficient to establish secondary meaning when compared to plaintiff's $2 million in annual sales where plaintiff's advertising expenditures represented only approximately 5% of its revenue.  *Id.*  Likewise, in *Ashland Oil,* the court examined plaintiff's advertising expenditures and compared it with plaintiff's annual sales and found that $164,228.75 in advertising expenditures compared to $2,466,578 in sales revenues (or 6.66%) was insufficient to show

advertising beyond that which was needed to "merely survive." *Ashland Oil* 64 F.3d at *5, n. 3.

Plaintiff generated $5-7 million in gross revenue and spends approximately $350,000 per year on advertising, comprising only 5-7% percent of its total revenue. APP 344-45. Because Plaintiff's general advertising expenditures represents only 5-7% of its revenue, Plaintiff's advertising expenditures fail to meet the threshold requirements of the "extensive advertising" the Sixth Circuit requires to establish indirect evidence of secondary meaning. Moreover, none of this advertising is directed towards the trade dress at issue.

Plaintiff advertises its rifle scopes online, in print media, on television and at trade shows. APP 317-18, 334-35. None of Plaintiff's advertising, however, emphasizes the scalloping on its rifle scopes. APP 648, 651-52, 501-27, 529-602, 1029-51, 1055. Plaintiff clearly does not advertise its claimed trade dress. *Id.* And Plaintiff's former employees confirmed this fact. APP 648, 651-52, 1797.

Moreover, Plaintiff does not inform its consumers that it is claiming trade dress rights in the scalloping by marking any images of its product with the ™ symbol in its online advertising, catalogs or product packaging. APP 321-322.1, 342, 501-27, 529-602, 1029-51, 1055. Plaintiff also does not inform its consumers in its television and print advertisements that it is claiming trade dress rights in the scalloping design. APP 323-24, 342. The only way Plaintiff communicates to its

consumers that its claiming trade dress rights in the scalloping design is through use of the images of its products.  APP 324-324.1.  Plaintiff never, for example, informs consumers to look for its scalloping design.  APP 324.1, 335.1-337, 501-27, 529-602, 1029-51, 1055.  If they think about it at all, consumers would have to guess as to whether or not Plaintiff is claiming any trade dress rights in "scallops on a scope."

Even internally, Plaintiff does not explain to its own employees, distributors or retailers the importance of its asserted trade dress, that it should be protected or that it is exclusively associated with Plaintiff.  APP 647, 327-30, 528, 1794. Plaintiff fails to even mention its asserted trade dress in a "Quick Guide" created and distributed by Plaintiff to its employees and customers to identify counterfeit products.  APP 327-30, 528.

The differences between Plaintiff's scalloping design and other designs on the market are so minor that a consumer would be unable to discern any meaningful differences in print advertising and online advertising.   Plaintiff's corporate representative repeatedly stated that she could not clearly discern whether or not a competing product had Plaintiff's claimed trade dress because of the quality, lighting, or the size of the photographs contained in print and online advertising materials.  APP 294, 298-301, 302-4, 368-424.  Instead, Plaintiff's corporate representative testified that in order to ascertain whether a competitor's

rifle scope bears the Plaintiff's trade dress, she would need to look at it carefully and that it would be important to have good photographs or a physical sample. APP 305. In fact, at one point during Plaintiff's deposition, Plaintiff's counsel requested a magnifying glass for Plaintiff's corporate representative to see if the wave-like scallops appearing on the competitors' products were similar to Plaintiff's design. APP 293.

All of this evidence is consistent with the conclusions of Defendants' expert, Emmanuel Kapelsohn. Mr. Kapelsohn stated that "the differences between the Leapers knurling patterns and some others on the market are so minor, and in some cases so subtle, that a potential purchaser would have to be remarkably observant, or would have to come equipped with measuring devices, to allow him to distinguish the Leapers knurling from some others on the market." APP 1224, *see also* APP 628, 631-32, 634. The amount and manner of advertising all weigh against a finding of secondary meaning.

> ### e.   The amount of sales and number of customers does not support secondary meaning of Plaintiff's trade dress.

Plaintiff generates annual sales of $5-7 million for its optics products. APP 341. Plaintiff sells its scopes to approximately 1,500 customers. APP 25-26. The total sales and number of customers are not sufficient in and of themselves to warrant a finding of secondary meaning. More importantly, Plaintiff failed to produce specific sales numbers for the scopes it sells that have the scalloping

design at issue.  Plaintiff sells scopes with and without scallops.  Thus, by only producing gross numbers for all of the scopes it sells, Plaintiff falls short of producing relevant evidence on secondary meaning.

<blockquote>

**f.  Plaintiff's place in the market does not support secondary meaning.**

</blockquote>

There is no evidence that Plaintiff has a significant market share.  APP 346-47.  Plaintiff does not know how many competitors are in the rifle scope market or whether a single rifle scope producer has a majority share of that market.  *Id.* According to Plaintiff's firearm's expert, there are over 100 rifle scope brands marketed in the United States and the majority share of the tactical rifle scope market is represented by four rifle scope manufacturers, none of which include Leapers.  APP 1402-05.  Given the number of rifle scope producers, the rifle scope market appears to be fragmented and highly competitive with a number of manufacturers and producers.  Lack of any evidence of Plaintiff having any sizeable share of the rifle scope market weighs against a finding of secondary meaning.

<blockquote>

**g.  There is no evidence of intentional copying.**

</blockquote>

"Intentional copying may be used to show secondary meaning as the seventh factor in [the Sixth Circuit's] seven-factor test, but it is only one of many considerations in that test and does not alone establish secondary meaning." *Gen. Motors Corp.,* 468 F.3d at 419.  Plaintiff has not only failed to allege that

28

Defendants intentionally copied its trade dress (Dkt. 1, Pg. ID 1-15), but it also admits that there is no evidence of intentional copying. APP 349-50. This factor likewise weighs against a finding of secondary meaning.

Given the strong direct evidence of no secondary meaning and the lack of sufficient indirect evidence to support any of the other secondary meaning factors, Plaintiff cannot meet an essential element of its trade dress infringement claim as a matter of law.

### 2.    Plaintiff's Trade Dress is Functional.

On April 17, 2015, the United States Patent and Trademark Office issued a second office action refusing registration of the trade dress that is the subject of Plaintiff's Application Serial No. 86251178 (which is identical to Plaintiff's asserted trade dress in this litigation) on the basis that the mark is functional. APP 1834-39.

To succeed in a trade dress infringement claim, Plaintiff must also prove that its trade dress is non-functional. 15 U.S.C. § 1125(a)(3) ("the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional"). "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or the purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001). "Where the design is functional under [these factors], there

29

is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33. "The Supreme Court in *TrafFix Devices* made clear that if a particular design is functional, other producers do not have 'to adopt a different design simply to avoid copying it.'" *Antioch Co. v. W. Trimming Corp.,* 347 F.3d 150, 159 (6th Cir. 2003) (quoting *TrafFix*, 532 U.S. at 35).

In *TrafFix*, the Supreme Court found the "dual-spring design" employed at the base of road signs to make them withstand strong wind gusts was functional and therefore could not be protected as trade dress. *Id.* at 34.

Similarly, in *Groeneveld*, the Sixth Circuit found that the design of plaintiff's grease pump was functionally determined by the amount of material needed in the pump's construction, by the volume and height of the grease reservoir, and by the amount of grease that the vehicle needed at each service interval. 730 F.3d at 505. The court found that the pump's cast aluminum base containing the pump's mechanisms and the clear plastic reservoir to hold the grease were components that clearly served a function essential to the product's operation. *Id.* at 504-05. The court noted that the surface area of the pump and the volume of the reservoir were functionally determined by the necessity of fitting it into the base and holding a predetermined amount of grease. *Id.* at 505. The court found that the overall design of the grease pump was functional and therefore not protected under the Lanham Act as trade dress. *Id.*

Likewise, in *Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*, the Sixth Circuit found that fishing guidelines were functional designs and available for copying by the public. 461 F.3d 675, 686 (6th Cir. 2006).

Finally, in *Antioch Co. v. Western T. Corp.*, the Sixth Circuit found that the dual strap-hinge design, spine cover, padded album cover, and reinforced pages were all components essential to the use of the scrap book albums and were, therefore, functional and not eligible for trade dress protection. 347 F.3d 150, 157 (6th Cir. 2003). The court agreed with the district court's conclusion that "[t]he straps hold the album together and produce the advertised functional benefits of allowing the pages to lie flat when the album is open, permitting their easy turning, and enabling the insertion of additional pages." *Id.* The court also agreed with the district court's conclusion that "the album's pages [were] purely functional because the ribbed edges have the effect of reinforcing the pages; keeping the pages separated, and thus, permitting air to circulate between them; and holding the staples in place on a particular page." *Id.* (internal quotations omitted). Based on this evidence, the court agreed with the district court's conclusion that there was no genuine issue of material fact regarding the functionality of the design of the album. *Id*.

In this case, Plaintiff's trade dress is functional because the knurling on the adjustments is essential to the use and purpose of the rifle scope. Knurling

provides the user with a good gripping surface, and allows adjustments to be made by hand, without the use of tools, even when the user is wearing gloves, the user's hands might be cold, or the user's hands and the scope itself might be wet. *Id.*; *see also* APP 289.2-291, 293, 1310-13, 1798-99, 1802, 1804.    The Trademark Office agrees.  APP 1834-39.  Knurling or scalloping is essential to the use and operation of Plaintiff's scopes and is designed for the functional purpose of getting a better grip on the knurled part.  APP 1540-49.

Further, Defendants' firearms expert, Emanuel Kapelsohn, concluded that "[i]n addition to the 'aid-in-gripping' purpose common to all knurling, the knurling on scope adjustment knobs permits the scope adjustment knobs to be turned easily against a certain degree of engineered or 'built in' resistance." APP 1542-43.  The knurling on scope knobs also allows the adjustments to be made with the requisite precision.    APP 1543-47.    Finally, in many cases the small size of scope adjustment knobs limits the surface area on which knurling can be applied.  APP 1547.  The small diameter of the knobs, and the thin dimension of the tubular material forming the scope ocular and objective bells, functionally limits the depth of the knurling grooves and the patterns that can be used. *Id.*

Mr. Kapelsohn also concluded that the knurling on Plaintiff's scopes, like the knurling on almost all scopes with "target-type" adjustment knobs or turrets, serves a function essential to the scope's operation and use.  APP 1549.  Without

it, the scope adjustments would be far more difficult to make with precision, and in some conditions would be impossible to make at all. *Id.* In addition, the knurling pattern is substantially influenced by the small surface areas of the adjustment knobs and turrets. *Id.* A scope without knurling on its adjustments would be an inferior product, and would be at a significant disadvantage in the marketplace. *Id.*

Even Plaintiff's own user manual explains that "[t]urrets are manufactured with easy to grip finger adjustment design, making adjustments simple, even whilst wearing gloves." APP 538. Plaintiff's advertisements likewise tout "most user friendly target turrets," "turrets are manufactured . . . with easy to grip rings making adjustments simple even whilst wearing gloves," "[f]inger adjustable turrets are manufactured with easy to grip design," "easy-to-grip tactical finger adjustment to enhance tube integrity and accurate shooting," "coin adjusted w/e [windage/elevation] to finger adjustable," and "ergonomic power ring and diopter for most user friendly adjustment." APP 529-31, 533, 535, 1516-19. Plaintiff's advertisements also highlight that the turrets are finger adjustable and that the turrets can serve as a mating piece to receive a large wheel with the scallops on the turret functioning as teeth to interlock with the wheel. APP 1518-19. Evidence of this nature constitutes strong evidence of functionality. McCARTY §7:74.

It is common knowledge that knurling assists to enhance grip. There are a myriad of items manufactured with knurling. *Id.* Examples of items with knurling

33

include machinist's punches, drill chucks, tool handles of all sorts, thumbscrews and thumb nuts, adjustment knobs on measuring tools, tightening knobs on clamps and vices, adjustment knobs on tripods and cameras, rotating lamp switches, jar lids, car dashboard knobs, faucets, spray bottle caps, and many other items.  APP 1540-41.

Knurling is likewise widely used on various parts and surfaces of firearms. APP 1541.  It is used on the hammer spurs, manual safeties, slide stops, magazine catches, bolt catches, sight adjustment drums and knobs, caps of tubular magazines, the ends of tubular magazine liners, grips, grip frames, backstraps, trigger guards, and grooved triggers, as well as many others. *Id.* All of these surfaces provide the user with a gripping surface they would not otherwise have on smooth metal parts. *Id.*

The common understanding of the function of knurling is also recognized among many other competitors and on-line reviewers who recognize the functional nature of scalloping on the adjustable features of the rifle scope.  APP 1457-83.  A number of firearm enthusiasts testified that the knurling on the adjustment knobs is essential to make the knobs easier to grip and turn especially when using gloves or in inclement weather.   APP 1522-28.   Even Plaintiff's former employees confirmed that the "scallops on the scope" are functional.  APP 289.2-291, 293, 1798-99, 1802, 1804.

The evidence is overwhelming that Plaintiff's alleged "scallops on a scope " trade dress is purely functional, Plaintiff cannot meet this element of a trade dress infringement claim.   On this basis alone   Defendants are entitled to summary judgment as a matter of law.

**B.**    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR FALSE DESIGNATION OF ORIGIN OR SPONSORSHIP.**

Plaintiff also alleges that "Defendants' conduct constitutes false or misleading descriptions, and false designation of origin and/or sponsorship of Defendants' goods in violation of § 43(a) of the Lanham Act, as amended, 15 U.S.C. §1125(a)." (Dk. 1, pg. ID 6, ¶ 36).  Section 43(a) "'does not have boundless application as a remedy for unfair trade practices, . . . but can apply only to certain unfair trade practices prohibited by its text.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 29 (2003) (quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2nd Cir. 1974)). Section 43(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another

> person's goods, services, or commercial activities, shall be liable in a
> civil action.

"[A] necessary element" of a false designation claim is "a false designation of origin or false description or representation of the goods or services." *Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir. 1998). False designation "does not merely refer to geographic origin, but also to origin of source or manufacture." *Federal–Mogul– Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 408 (6th Cir. 1963). Thus, false designation of origin may consist of "false representations of the source of a product . . . or, as it is otherwise known, 'passing off.'" *Frish's Restaurants, Inc. v. Elby's Big Box*, 670 F.2d 642, 646-47 (1982). Passing off occurs when a producer misrepresents his own goods or services as someone else's. *Dastar* 539 U.S. at 27 n. 1 (2003). Likewise, false designation may consist of reverse passing off. *Id.* Reverse passing off occurs when the producer misrepresents someone else's goods as his own. *Id.* When a producer markets and sells its own products, it cannot be held liable for false designation of origin. *Id.* at 38.

Here, Defendants have not sold Defendants' products bearing Plaintiff's UTG or ACCUSHOT brands. APP 331-33, 638, 639-41, 1315-16. Defendants have likewise never sold Plaintiff's products under the SNIPER or SUN OPTICS brands. APP 348, 638, 639-41, 1315-16. Therefore, Plaintiff's false designation of origin claim fails as a matter of law.

C.    **PLAINTIFF'S CLAIMS FOR COMMON LAW TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, VIOLATION OF M.C.L.A § 429.42, AND VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, M.C.L.A. § 445.903(1) ARE ALL GOVERNED BY THE SAME STANDARDS AS PLAINTIFF'S LANHAM ACT CLAIMS AND THEREFORE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THESE CLAIMS.**

The Sixth Circuit has made clear that Lanham Act and Michigan state law unfair competition claims are governed by the same standards. *LeeLanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504 (6th Cir. 2007) (Michigan statutory and common law is the same likelihood of confusion test as under federal trademark and uncompetition law); *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833 (6th Cir. 1983) (test of likelihood of confusion is the test under both federal and Michigan law); *T.D.C. Intern Corp. v. EZ Movers, Inc.,* 2014 WL 10988 at *4 (E.D. Mich. 2014); *Schreiber Mfg. Co. v. Saft America, Inc.*, 704 F.Supp. 759, 769 (E.D.Mich.1989); *Empire Nat. Bank of Traverse City v. Empire of America FSA*, 559 F.Supp. 650, 654 (W.D.Mich.1983). Unfair competition claims, including common law trademark infringement, and unfair business practices under the Michigan Consumer Protection Act are also governed by the same standards as the Lanham Act. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1104-05, n. 1 (6th Cir. 1991).

Because Plaintiff failed to prove essential elements of its Lanham Act claims, Defendants are entitled to summary judgment on Plaintiff's claims for common law trademark infringement, unfair competition, violation of M.C.L.A §

492.42, and violation of the Michigan Consumer Protection Act, M.C.L.A. § 445.903(1).

**D.    THIS COURT SHOULD ORDER THAT PLAINTIFF'S MICHIGAN AND CALIFORNIA REGISTRATIONS FOR ITS TRADE DRESS BE CANCELLED.**

Plaintiff procured a Michigan Registration (Registration No. M12557) from the Michigan Department of Licensing and Regulatory Affairs for "the distinctive design utilized by Leapers Inc. on the bells and knobs of its scopes and sights." APP 1521.  Plaintiff also obtained a California Registration (Registration No. 115,662) for a "wave-like scalloping design that Leapers affixes to its scopes." APP 1520.  For the reasons stated above, Defendants request the Court order that these registrations be cancelled.  Cal. Bus. and Professions Code § 14230; M.C.L.A. § 429.38 (a trademark registration shall be cancelled when a court of competent jurisdiction orders so).

## V.    CONCLUSION

For the reasons stated, Defendants respectfully request that this Court grant Defendants' motion, dismiss Plaintiff's claims with prejudice, order that Plaintiff's Michigan and California Registrations be cancelled, and enter all such other relief to which they are entitled.

Respectfully submitted,


  /s/*Joseph F. Cleveland, Jr.*
Joseph F. Cleveland, Jr.
Texas Bar No. 04378900
jcleveland@belaw.com
BRACKETT & ELLIS, P.C.
100 Main Street
Fort Worth, Texas  76102-3090
Telephone:  (817) 338-1700
Facsimile:   (817) 870-2265


James K. Thome
P25629
jthome@VGpcLAW.com
VANDEVEER GARZIA, PC
1450 Long Lake Road, Suite 100
Troy, Michigan  48098
Telephone:  (248) 312-2800
Facsimile:   (248) 267-1242


ATTORNEYS FOR DEFENDANT
SUN OPTICS USA


/s/ *Douglas P. LaLone*
Douglas P. LaLone (P45751)
Barbara L. Mandell (P36437)
Melissa R. Atherton (P76532)
FISHMAN STEWART YAMAGUCHI,
PLLC
39533 Woodward Ave., Suite 240
Bloomfield Hills, MI 48304
Tel.: (248) 594-0600
Fax: (248) 594-0610
dlalone@fishstewip.com
bmandel@fishstewip.com
matherton@fishsteweip.com

39

ATTORNEYS FOR DEFENDANTS
SMTC, LLC AND TRARMS, INC.
AND COUNTER-PLAINTIFF
CHUANWEN SHI

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2015, I electronically filed the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a Notice of Electronic Filing to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means and on counsel for Plaintiff as follows:

Brian D. Wassom
Honigman Miller Schwarz & Cohn LLP
39400 Woodward Ave., Suite 101
Bloomfield Hills, MI  48304
Via E-mail (bdw@honigman.com)
and First Class Mail

 /s/*Joseph F. Cleveland, Jr.*
Joseph F. Cleveland, Jr.

494325-v1/13988-002000

40