# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Leapers, Inc.,

        Plaintiff,

                             2:14-cv-12290- RHC-DRG

v.

SMTS, LLC d/b/a Tuff Zone, Trarms, Inc.,    The Honorable Robert H. Cleland
and Sun Optics USA                      Magistrate Judge David R. Grand

               Defendants

SMTS, LLC d/b/a Tuff Zone, Trarms, Inc.,
and Chuanwen Shi,

             Counter-Plaintiffs,

                           **PLAINTIFF LEAPERS, INC.'S RESPONSE**
                           **TO DEFENDANTS'**
v.                                **MOTION FOR SUMMARY JUDGMENT**

Leapers, Inc. and Continental Incorporated,
Inc. d/b/a Continental Enterprises,

             Counter-Defendants.

---

Brian D. Wassom                Barbara L. Mandell
Jeremy D. Lockhart            Douglas P. LaLone
HONIGMAN MILLER SCHWARTZ & COHN   Melissa R. Atherton
LLP                        Thomas A. Hallin
39400 Woodward Ave., Suite 101     RADER, FISHMAN & GRAUER PLLC
Bloomfield Hills, MI 48304         39533 Woodward Ave.
248-566-8490                    Bloomfield Hills, MI 48304
bdw@honigman.com            248-594-0600
                                 blm@raderfishman.com
Darlene R. Seymour           *Attorneys for Defendants/Counter-Claimants*
CONTINENTAL ENTERPRISES    *SMTS, LLC d/b/a Tuff Zone and Trarms, Inc.*
1292 E. 91st Street
Indianapolis, IN 46240
dseymour@ce-ip.com

Michael A. Lisi
BRIDGE INTELLECTUAL PROPERTY
SERVICES PLLC
27332 Woodward Avenue, Suite 200
Royal Oak, MI 48067
248-284-0900
mlisi@bridgeip.net
*Attorneys for Plaintiff/Counter Defendant*
*Leapers, Inc.*

Jonathan G. Polak
TAFT, STETTINIUS
One Indiana Square, Suite 2500
Indianapolis, In 46204
317-713-3500

Steven C. Susser
CARLSON, GASKEY & OLDS, P.C.
400 West Maple Road, Suite 350
Birmingham, MI 48009
248-988-8360
ssusser@cgolaw.com
*Attorneys for Counter-Defendant Continental*
*Incorporated, Inc. d/b/a/ Continental*
*Enterprises*

James K. Thome
Thomas M. Peters
VANDEVEER GARZIA
1450 West Long Lake Road
Suite 100
Troy, MI 48098
248-312-2800
jhome@vgpclaw.com

Joseph F. Cleveland
BRACKETT AND ELLIS P.C.
100Main Street
Fort Worth, TX 75102
817-338-1700
jcleveland@belaw.com
*Attorneys for Defendant Sun Optics USA*

## <u>Issues Presented</u>

1.      Should Defendants' motion for summary judgment be denied where the central Defendant refuses to testify regarding any meaningful issue in the case, including each of the issues raised in Defendants' motion?

2.      Has Leapers demonstrated a genuine question of material fact regarding the secondary meaning of its trade dress?

3.      Has Leapers demonstrated a genuine question of material fact regarding the non-functionality of its trade dress?

## Controlling / Most Appropriate Authority

- *Baxter v. Palmigiano*, 425 U.S. 308 (1976)
- *Two Pesos v. Taco Cabana*, 505 U.S. 763 (1992)
- *Hana Financial, Inc. v. Hana Bank*, 574 U.S. _ (Jan. 21, 2015)
- *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590 (6th Cir. 1989)
- *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235 (6th Cir. 1991)
- *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298 (6th Cir. 2001).
- *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir. 2002)
- *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442 (6th Cir. 2002)
- *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150 (6th Cir. 2003)
- *Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005)
- *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. 2006)
- *Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*, 461 F.3d 675 (6th Cir. 2006)
- *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494 (6th Cir. 2013)
- *Wheat v. Fifth Third Bank*, No. 13-4199, _ F.3d _ (6th Cir. May 7, 2015)

ii

# Table of Contents

Issues Presented ................................................................................................ i

Controlling/Most Appropriate Authority ................................................. ii

Index of Authorities ....................................................................................... iv

Counter-Statement of Material Facts ......................................................... ix

I.    Introduction ............................................................................................. 1

II.   Legal Standard: The Subjects of This Motion Are Facts That the Court Must Construe in Leapers' Favor ........................................................... 2

III.  Argument .................................................................................................. 2

      A.    Trarms' and Shi's Refusal to Testify Precludes Summary Judgment .............. 2

            1.    There Is Still Material Discovery That Leapers is Entitled to Take Before the Summary Judgment Motion Can Be Resolved ................... 2

            2.    The Adverse Inferences Created By the Assertion of the Fifth Amendment Reinforce the Existence of Genuine Issues of Material Fact ........................................................................................ 4

      B.    A Reasonable Jury Could Easily Hold That Leapers' Trade Dress Has Secondary Meaning .......................................................................... 5

            1.    A Secondary Meaning Determination Requires the Fact-Finder to Make Discretionary Balancing Judgments Unsuited for Summary Judgment ...................................................................................... 5

            2.    Leapers' California Registration Demonstrates Distinctiveness .......... 6

            3.    Defendants' Copying of the Trade Dress Was Indisputably Intentional, Which By Itself Creates a Presumption of Secondary Meaning .......... 7

                  a.    Intentional Copying Raises a Presumption of Secondary Meaning .................................................................................. 7

b.    Shi's Long-Time Role as Leapers' Supplier, and His Disregard of Leapers' Specific Instructions, Makes His Intent Obvious .... 8

c.    Shi's Apparent Forgery of Documents Shows His Bad Intent ... 9

d.    Defendants' Wholesale Copying of Leapers' Product Documentation .......................................................................... 9

e.    Shi Appears to Have Previously Counterfeited Leapers Scopes ................................................................................... 10

4.    Defendants Ignore the Copious Amount of Direct Consumer Testimony Verifying That Leapers' Trade Dress Has Secondary Meaning ............................................................................... 10

a.    Eight Sworn Declarations Confirm Secondary Meaning ......... 10

b.    The Alleged First Sale Date of the Shorty 40 Scope Is Insignificant ............................................................................ 12

i.    Defendants Overstate the Applicable Legal Rule ........ 12

ii.    Defendants Have No Evidence to Support Their Argument .................................................................. 13

iii.    Every Other Accused Scope Is Far More of an Infringement ............................................................. 13

5.    The Parties' Competing Consumer Surveys Create a "Battle of the Experts" That Must Be Resolved by the Jury ..................................... 15

a.    Surveys Are Neither Dispositive Nor Proper to Weigh at the Summary Judgment Stage .................................................... 15

b.    The Kupritz Survey Rebuts Defendants' Survey Results .................................................................................... 16

6.    Leapers Has Strong Evidence With Respect to Exclusivity, Length, and Consistency of Use..................................................... 17

iv

a.      The Existence of Allegedly Older and Arguably Similar Designs Proves Nothing ......................................................................... 17

b.      Even if Third-Party Designs Were Relevant, Leapers Has Distinguished Its Design From Them ...................................... 18

c.      Even if Third-Party Designs Were Relevant, Defendants Have Waived the Argument By Failing to Support It ........................ 19

d.      Leapers' White-Label Scopes Still Originate From a Single Source ..................................................................................... 19

e.      Alleged Variations in Trade Dress .......................................... 20

7.      Genuine Issues of Material Fact Exist Regarding Leapers' Sales, Customers, Market Position, and Advertising .................................... 22

C.      A Reasonable Jury Could Easily Hold That Leapers' Trade Dress Is Non-Functional .................................................................................... 23

1.      Functionality Only Exists Where the Designer's Subjective Motivations Are Driven By Functional Considerations .......................................... 23

2.      Multiple Witnesses Attest That the Design of Leapers' Trade Dress Was Driven Solely By Aesthetic, Not Functional, Considerations ...... 24

3.      Leapers' California Registration Demonstrates Non-Functionality ..... 25

4.      Defendants Offer Nothing But Ipse Dixit and Disagreement in Response ........................................................................................ 26

5.      Shi's Chinese Design Patent Application Raises Questions About Whether the Trade Dress Is Non-Functional .................................... 27

D.      Leapers' Remaining Causes of Action Survive for the Same Reasons ......... 28

IV.      Conclusion ................................................................................................ 28

## Index of Authorities

CASES                                                                     Page(s)

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
    280 F.3d 619 (6th Cir. 2002) ................................................................... 7

*Antioch Co. v. W. Trimming Corp.*,
    347 F.3d 150 (6th Cir. 2003) ................................................................. 23

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) .............................................................................. 4

*Blockbuster Entm't Grp. v. Lazlo, Inc.*,
    869 F. Supp. 505 (E.D. Mich. 1994) ..................................................... 16

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
    871 F.2d 590 (6th Cir. 1989) .......................................................... 5, 12

*Coach Leatherware Co. v. Ann Taylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991) ................................................................. 6

*Ferrari S.P.A. v. Roberts*,
    944 F.2d 1235 (6th Cir. 1991) ...................................................... 7, 23, 24

*Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*,
    461 F.3d 675 (6th Cir. 2006) ............................................................... 23

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
    468 F.3d 405 (6th Cir. 2006) ..................................................... 5, 15, 23

*Goscicki v. Custom Brass & Copper Specialties, Inc.*,
    229 F. Supp. 2d 743 (E.D. Mich. 2002) ................................................ 7

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    730 F.3d 494 (6th Cir. 2013) ......................................................... 5, 23

*Hana Fin., Inc. v. Hana Bank*,
    574 U.S. _, (Jan. 21, 2015) ................................................................ 21

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
    270 F.3d 298 (6th Cir. 2001) ........................................................ 15, 16

*Humantech, Inc. v. Caterpillar, Inc.*,
   2012 U.S. Dist. Lexis 127499 (E.D. Mich. Sept. 7, 2012) ................................................ 2

*Innovation Ventures, LLC v. N2G Distrib., Inc.*,
   779 F. Supp. 2d 671 (E.D. Mich. 2011) ........................................................................ 8

*Phillips v. Cohen*,
   400 F.3d 388 (6th Cir. 2005) ...................................................................................... 15

*Sally Beauty Co. v. Beautyco, Inc.*,
   304 F.3d 964 (10th Cir. 2002) ...................................................................................... 6

*Saratoga Vichy Spring Co. v. Lehman*,
   625 F.2d 1037 (2nd Cir. 1980) .................................................................................... 12

*SEC v. Colello*,
   139 F.3d 674 (9th Cir. 1998) ........................................................................................ 4

*Two Pesos v. Taco Cabana*,
   505 U.S. 763 (1992) .................................................................................................. 28

*U.K. Abba Prods. v. Employers Ins. of Wausau*,
   2002 Cal. App. Unpub. ............................................................................................. 25

*U.S. v. Philatelic Leasing*,
   601 F. Supp. 1554 (S.D.N.Y. 1985) .............................................................................. 9

*Wheat v. Fifth Third Bank*,
   No. 13-4199, _ F.3d _ (6th Cir. May 7, 2015), ................................................................ 2

*Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*,
   359 F. Supp. 2d 561 (E.D. Ky. 2004) ............................................................................ 6

**STATUTES**

15 U.S.C. §1125(a)(3) ................................................................................................... 25, 28

**OTHER AUTHORITIES**

2 WIGMORE ON EVIDENCE § 278 (Chadbourn rev.1979) ........................................................... 9

Fifth Amendment ...................................................................................................... *passim*

Fed. R. Civ. P. 56(c)(2) ................................................................................................... 27

Fed. R. Civ. P. 56(d) ................................................................................................ 3

Fed. R. Evid. 801(c), 802 ....................................................................................... 27

6 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:119 (4th ed.) ............................ 6

## <u>Counter-Statement of Material Facts[1]</u>

1.      Admitted.

2.      This statement is accurate as far as it goes, but it is an incomplete description of the record concerning Leapers' trade dress. The visual representation of Leapers' trade dress in Dkt. #36 was intended to be representative only. The Complaint alone gives dozens of examples of scopes of different size and shape. Leapers' discovery responses have further clarified and illustrated the various model numbers that bear the trade dress. *See* App. 1841-42 (Feb. 17, 2015 Supp. Interrog. Response); App. 1844-54 (Leapers UTG Optics Trade Dress Overview, prepared by Leapers to visually represent the various models bearing the trade dress). Leapers principals Tina and David Ding also gave extensive deposition testimony concerning the trade dress. To the extent that the language of Dkt. #36 is subject to multiple interpretations, it must be interpreted in a manner consistent with all of these sources.

3.      Denied. Certain of Defendants' statements here are individually accurate, but Defendants take them out of context to construct a false argument. Specifically, Defendants characterize Leapers President Tina Ding, to whose deposition testimony Defendants cite here, as saying that Leapers' trade dress covers any application of scalloping to "one or more" individual scope components. That is the precise opposite, however, of what Ms. Ding said in the testimony to which Defendants cite.

---

[1] These paragraphs are cited *infra* as "Counterfacts."

The stipulation filed as Dkt. #36 claims as an element of the trade dress the fact that the scalloping design is "used on all surfaces where an adjustment can be made on the scope." (Pg ID 516.) Consistent with that language, Ms. Ding testified that the trade dress consists of "the design on the [entire] scope, the coordinated look of all the parts with the scalloping design as depicted in the diagram [in Dkt. #36]." (Pg. ID 1560, App 278); *see also* Pg. ID 1564, App 282 ("It's the impression you pick up when you look at this complete scope, *not a particular component*." [emphasis added]). She later clarified what the phrase "surfaces where an adjustment can be made" in the stipulation means. Those "applicable components" include such adjustments as the "turrets … power ring, [diopter, etc.]" (Pg. ID 1580, App 295). Various models of scopes may have various numbers of these adjustable components; for example, some scopes do not have a "parallax" or "AO" ring, while others may have one, two, or three turrets. But "if it has all these various components … [then] the trade dress would be appropriately applied [consistently on each of them.]" (Pg. ID 1580, App 295.)

An illustration from one of Leapers' User Manuals is reproduced below (see App. 1855-62 for context) to give context to this discussion. It illustrates a scope with multiple adjustment rings, each of which bears a consistent scalloping design. It is the overall impression created by this consistency that Leapers claims as an element of its trade dress.



4.      This statement is accurate as far as it goes, but it is an incomplete description

of the record. Leapers has claimed a first use date of "at least as early as" February 2003 in

its federal trademark application, but this does not rule out an earlier date of first use—exactly as Leapers' representative testified in the record portion cited by Defendants. See App. 358.1-358.2, Pg ID 1625-26. Leapers has consistently identified the year 2002 as when it first began designing and implementing the trade dress. *See* App. 1877-78, 1884 (D. Ding Dep. at 113, 117-18, 232). Indeed, at Defendants' request, Leapers produced for inspection several exemplar scopes, including models with serial numbers indicating they were manufactured in 2002. *See* T. Ding Dec. ¶11 (Dkt. #81, PgID 3765-66); App. 2140-45 (photos). Similarly, although it is true that Leapers does not *yet* own a federal registration in the trade dress, and that the PTO's examining attorney has twice issued *preliminary* refusals, the application process is continuing. Indeed, on Feb. 17, 2015, the examining attorney *approved* Leapers' application for publication. App. 1891. Only a series of last-minute, *ex parte* protest letters from the Defendants in this case to the PTO caused the examining attorney to revisit and (preliminarily) refuse the registration, but Leapers now has an opportunity to respond to that decision. App. 1834-39.

5.     Leapers can neither confirm nor deny these assertions, as they are based solely on Defendants' testimony. Therefore, Leapers does not admit them, and leaves Defendants to their proofs. Regardless, as Leapers explains further herein, Leapers specifically denies that the alleged dates of sale for the CSP26 model scope has anywhere near the significance to this motion that Defendants accord it.

6.    David Ding, co-founder of Leapers, is an accomplished designer of optics products. Both he and others involved in the process testified that Mr. Ding began the design process that led to the trade dress in approximately 2000, culminating in the trade dress design that was first manufactured in late 2002 and sold in the United States as early as February 2003. These scopes were manufactured by the Jinkajin (Golden Image) factory in China. D. App 1875, 1882-83 (Ding Dep. at 61-64, 201, 228-29); App. 1896-97 (T. Ding Dep. at 83-86); App. 1909-13 (L. Zheng Dec. ¶¶9-11); App. 1919-20 (H. Cheng Dec. ¶¶6-7). Therefore, the trade dress was created and existed for a significant period of time before Leapers ever provided it to Shi.

7.    In 2004, Tina Ding invested in a new Chinese factory called Nantong WuYang Sporting Goods ("WuYang"). Although she owned the factory on paper, its activities were managed and controlled by Chuanwen Shi and his partner Donghui Yang. T. Ding Dec. ¶8 (PgID 3762-63); *see* App. 1940 (Shi Dep. at 71); Counterclaims ¶8, Pg. ID 570. A 2006 agreement acknowledged that WuYang and a related machine shop named Nantong LongTian Electro-Optical ("LongTian"),[2] also operated by Shi, would exclusively fulfill Leapers' orders for the scopes. App. 1946-47 (Agreement); App. 1886-90 (D. Ding Dep. 290-93, 299-308). In the same document, Shi and Yang also agreed that they would "never disclose any information related to Leapers' products or client information." App. 1946-47.

---

[2] The same facility has been referred to in other documents by slightly different names, such as "Nantong Longtian Photoelectric Instrument." These appear to simply be different English translations for the same entity.

From that point until 2011, the WuYang factory under Shi's direction manufactured all of Leapers' scopes bearing the trade dress.

8.      Shi was never responsible for designing the trade dress. He did not possess the necessary design skills or experience. App. 1913 (Zheng Dec. ¶12). Shi's only role in his relationship with Leapers was to manufacture scopes bearing the trade dress pursuant to Leapers' instructions.

9.      Effective November 17, 2011, Leapers canceled its remaining orders and ended its relationship with WuYang. In an email copying Shi (among many others), Leapers gave WuYang specific instructions to stop using Leapers' designs:

> 1. Effectively immediately, <u>cease using any and all technical specifications, product design documents, packaging design documents related to any of Leapers products. Any and all such material should be destroyed and cannot be copied, disclosed to other parties, or used on any other products</u>.
>
> 2. Destroy any and all parts, accessories, attachments, and the like, related to any of Leapers products previously produced to fulfill Leapers's orders. Any and all such material must not be disclosed to other parties or used on similar products. If there are any products already produced per Leapers's orders, please provide a product list within this week so that a one-time ocean shipment to us can be arranged the following week (11/21/2011 – 11/25/2011).
>
> 3. Destroy any and all packaging material, scope lens cleaning cloths, scope batteries and so on and they must not be disclosed to other parties or used on other products. * * *
>
> We hereby declare formally that any violation, infringing conducts of the above stipulations by your factory will be pursued legally by us. Any such infringement related to our OEM clients will be related to the OEM clients for pursuit. (App.1949 (emphasis added)).

10.     WuYang acknowledged this email. App. 1948. Separately, on November 18, 2011, Shi himself responded, demonstrating to Leapers that he was giving his employees at WuYang express instructions to cooperate with Leapers demands. He specifically directed two individuals to "take inventory of all Leapers' products' parts, accessories, packaging material ... [and] intellectual property related material," and that these tasks should be a "priority." App. 1954.

11.     The WuYang and/or LongTian factories remain under the direction of Chuanwen Shi. T. Ding Dec. ¶¶8, 12 (PgID 3762-63, 3766); App. 1857-58 (current Chinese records); App. 2146 (website for LongTian identifying its English name as "WuYang Sporting Goods").They produce the SNIPER-branded scopes sold by Trarms and SMTS, and several of the accused scopes sold by Sun, using the same designs previously supplied by Leapers and used to manufacture Leapers' scopes. Trarms admits that the "Sniper" scopes it and SMTS sell are manufactured by LongTian. App. 1960-61 (Interrog. Response #9.) Sun's corporate representative, Dale Sorenson, testified that Shi admitted using the same designs at LongTian to create Trarms' and Sun's accused scopes that he had previously used in manufacturing Leapers' scope. App. 1964 (Sorensen Dep. at 58). Similarly, SMTS representative Lisa Wang and Lion Gears employee John Xie—both of whom are former Leapers employees—agreed that Leapers and Sniper scopes were made by WuYang using the same design. App. 1967 (Dep. of Lisa Wang at 74); App. 1970-71 (Dep. of John Xie at 29-31).

xv

12.     SMTS began selling Sniper scopes in 2011. App. 1967 (Dep. of Lisa Wang at 108). Sun began sourcing scopes bearing Leapers' trade dress from LongTian in 2012 and selling them in 2013. App. 1963 (Dep. of D. Sorenson at 38). These scopes are, from all external appearances, replicas of the Leapers scopes WuYang and LongTian previously made for Leapers, including as to the trade dress. See, for example, the following side-by-side photograph of a Leapers and Sniper scope:



App. 1996-97 (Dep Ex 42). SMTS's representative could not identify any visual distinction in the relevant portions of these scopes, App. 1966 (Wang Dep. at 73-76), and Shi refused to admit the similarity, citing the Fifth Amendment.[3] App. 1936-37 (Shi Dep. at 56-58).

---

[3] Moreover, as seen in the photo above, Sniper's scopes are sub-branded as "Adventure Class," the same name that Crosman used on the Leapers scopes it sold. App. 2444.

13.    At least some user manuals, mil-dot reticle instructions, mil-dot reference table design, and even the battery warnings that currently ship with the Trarms and Sun scopes produced at LongTian are exact replicas of the manuals that WuYang had previously printed and included with Leapers' scopes—right down to the image reproduced above. Compare App. 2024-53 (Leapers documents) to App. 2054-2122 (Defendants' documents); App. 1887-88 (D. Ding Dep. 296-99). One manual used by Defendants shows a diagram of Leapers' current scope (with EZ-TAP console for 36-color illumination control) that Defendants do not even sell.[4] App. 2054-55, 2098, 2108.

14.    Shi appears to have forged documents relevant to this case at least twice. First, in this lawsuit, Defendants produced in discovery design drawings purporting to show that WuYang designed parts bearing the trade dress before 2004. App. 1998-2023 (Dep. Ex. 125). Official Chinese records show, however, that WuYang did not exist until June 24, 2004. App. 1952-53 (records), App. 1885 (D. Ding Dep. 243-44). The fact that the drawings are computer-generated, and yet bear a handwritten signature and date, is also highly unusual and suspect. *See* T. Ding Dec. ¶9 (PgID 3763-64); App. 1879-80 (D. Ding. Dep. at 126-28).

Shi admitted the second forgery incident, which occurred in China. Parallel with this litigation, Shi's LongTian factory initiated litigation in China claiming a design patent in Leapers' trade dress. In the course of those proceedings, LongTian falsified key evidence.

---

[4] Leapers owns U.S. Pat. 8,437,079 on its 36-color illumination operated through the EZ-TAP console. App. 2123-39.

Specifically, it filed documents purportedly signed by Shi in China during times when he was in the United States (facing criminal charges), along with falsified scope production images. When the forged evidence was challenged in court, LongTian admitted that Shi's signatures were made by others, and withdrew the evidence of scope production and physical sample images. *See* T. Ding Dec. ¶13 (PgID 3766); App. 1879-80 (D. Ding Dep. at 128-29).

15.    When deposed, Shi—citing the Fifth Amendment—refused to answer questions about his Chinese design patent, including questions on whether he needed to assert the design's non-functionality in order to obtain the design patent. App. 1932-33 (Shi Dep. at 40-43). He also refused to answer questions concerning the distinctiveness and non-functionality of Leapers' trade dress, which are the subjects of this summary judgment motion. App. 1936 (Shi. Dep at 53-54).

16.    In 2010, when Lion Gears employee John Xie worked for Leapers and Shi was still supplying Leapers with scopes, Leapers tasked Xie with investigating whether Shi and WuYang were selling counterfeit Leapers scopes to third parties. Xie's conclusion at the time was in the affirmative.[5] App. 1972-74 (Xie Dep. at 34-42).

17.    Defendant Trarms has actively refused to produce witnesses for deposition testimony on the key facts of the case, including those that are the subject of this motion.

---

[5] Leapers further notes that it continues to investigate incidents of counterfeiting and infringement, including several pertaining to the scope models at issue in this case. Shi's history of, and capacity for, copying Leapers' designs makes him a likely suspect in many of these cases, so Leapers may well continue to find more evidence of his intentional infringement. T. Ding Dec. ¶8.

On March 18, 2015, Shi—both individually and as Trarms' representative—relied on the Fifth Amendment to avoid giving testimony on any of the issues or documents in this case, including those relevant to the issues of secondary meaning and functionality raised by this summary judgment motion. See Dkt. #63.

18.     Also on March 18, 2015, Trarms' counsel represented to the Court that Zhang—whose deposition had already been noticed and agreed to by all parties—would be a suitable alternative witness. Nevertheless, on April 13, 2015—one day before Zhang's scheduled deposition—Trarms unilaterally refused to produce Zhang. Four days later, Defendants filed this summary judgment motion. Trarms has offered to produce Zhang only *after* the Court issues its summary judgment ruling. *See* Dkt. #76. Nevertheless, on Friday, May 15, 2015, Trarms responded to Leapers' motion to compel signed interrogatory responses (Dkt #76) by producing a verification from Zhang. This makes Zhang the signatory to *all* of Trarms' interrogatory responses, yet Trarms still refuses to produce him.

19.     An individual named Yunhang "Henry" Zhang is one of several who have been charged by the State of Indiana with felony criminal counterfeiting and forgery charges of the same types of Leapers scopes at issue in this case. In April 2015, he pled guilty to misdemeanor versions of these charges and received a suspended sentence of one year's imprisonment. App. 1975-95.

20.     On May 27, 2014, the U.S. Patent and Trademark Office issued U.S. Trademark Registration 4,535,557 on the principal register to Lightforce U.S.A. d/b/a

xix

Nightforce Optics, Inc., for the trade dress design on the adjustment surfaces of its riflescope, as depicted here:



App. 2392.

21.    Leapers does not *yet* possess a federal registration, but Defendants' selective account of the prosecution history of Leapers' federal application is misleading. The USPTO's examining attorney issued an initial office action requesting further evidence in support of both acquired distinctiveness and non-functionality—which is not unusual for such marks. Leapers' response to this office action and the corresponding evidence submitted therewith was deemed sufficient to prove both acquired distinctiveness and non-functionality with regard to Leapers' trade dress, and on February 17, 2015, the examining attorney approved the mark for publication on the Federal Register. App. 1891-94. Only then—while this litigation was pending—did Defendants cause a set of "protest letters" to be sent to the USPTO challenging the application. This led the examining attorney to stall the publication of the Mark and request a response to the protest letters mentioned above.

Leapers has until October 17, 2015 to respond, App. 1834, and is in the process of doing so. Leapers anticipates that its mark will, thereafter, again be approved for publication.

22.     Leapers has successfully registered its trade dress with multiple states. Of these, California in particular closely scrutinized Leapers' application. App. 2285-2391. It applied the same standards as the USPTO does, App. 2306, including with respect to whether Leapers' trade dress is distinctive in the marketplace, App. 2307, and as to functionality. App. 2285-87. After correspondence back and forth with Leapers' counsel, California ultimately agreed to register the trade dress. App. 1520.

# I. Introduction

It is counter-intuitive, to say the least, that a supplier-turned-infringer who pleads the Fifth Amendment to avoid testifying about his knock-off goods could avoid having to even stand trial for the infringement. Yet that is the result Defendants' motion seeks. Counter-Plaintiff Chuanwen Shi runs the Chinese factories that used to manufacture scopes for Leapers bearing its trade dress. Leapers canceled that relationship, so Shi began producing and selling scopes utilizing Leapers' designs to Defendants SMTS and Sun instead (both of whom admit the designs are the same as Leapers'), as well as through his own American company, Defendant Trarms. Summoned to testify about the very legal issues underlying this motion, Shi refused to answer. Trarms also declined to produce another witness who allegedly knows enough to verify its discovery responses, but not enough to answer deposition questions for the company—another dubious proposition.

Defendants have wisely opted not to argue that their near-exact replicas are unlikely to cause confusion. On the issues of secondary meaning and functionality that they do raise, however, Defendants offer nothing more than disagreement with Leapers' evidence, which falls far short of negating the obvious questions of material fact. Much worse, however, is that Defendants repeatedly cherry-pick the record and ignore Leapers' evidence entirely, which undercuts the credibility of their requested relief even further. Because Defendants cannot overcome the genuine issues of material fact on both issues raised in their motion, the Court should deny the motion and allow the jury to weigh the evidence.

## II. Legal Standard: The Subjects of This Motion Are Facts
## That the Court Must Construe in Leapers' Favor

Defendants' motion seeks summary judgment of Leapers' trade dress claims on two grounds: secondary meaning and functionality. As this Court has ruled, both of these are issues of fact, not of law. *See* Dkt. #26 (Oct. 3, 2014 Opinion) at Pg. ID 454 ("[f]unctionality is a factual determination" (quoting *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1246 (6th Cir. 1991)); *Humantech, Inc. v. Caterpillar, Inc.*, 2012 U.S. Dist. Lexis 127499, 24 (E.D. Mich. Sept. 7, 2012) ("The distinctiveness of a mark is a question of fact"). Therefore, this Court must construe all facts relevant to each issue in the light most favorable to Leapers.[6]

## III. Argument

### A.    Trarms' and Shi's Refusal to Testify Precludes Summary Judgment

#### 1.    There Is Still Material Discovery That Leapers Is Entitled to
#### Take Before the Summary Judgment Motion Can Be Resolved

Leapers has two motions pending that seek to compel testimony vital to the disposition of this summary judgment motion—specifically, the depositions of (1) Trarms' sole principal and Counter-Plaintiff Chuanwen Shi, (2) Trarms' employee Qian Zhang, and

---

[6] *See, e.g.*, *Wheat v. Fifth Third Bank*, No. 13-4199, _ F.3d _ (6th Cir. May 7, 2015), *slip. op.* at 13 ("Our analysis … must be overlaid with an understanding of the summary-judgment principles at play…. [A]t this preliminary stage of the litigation, [non-movant] need only identify genuine disputes of fact … in order to withstand a motion for summary judgment"); *id*. at 13-14 ("the court has no option but to credit [non-movant]'s version of the facts and, therefore, [resolve ambiguities in non-movant's favor and] presume that the comment upon which the [movant] purports to rely [but non-movant denies] was never made.")

(3) a Trarms' corporate representative. Shi refuses to testify on material issues, and Trarms refuses to produce Zhang before this motion is resolved. Counterfacts ¶¶12-13.

Not coincidentally, the witnesses that Trarms refuses to produce are also the defense witnesses most likely to have first-hand information on the issues raised in this summary judgment motion. After all, Shi (1) claims to have invented Leapers' trade dress, (2) runs the factory that produced scopes for Leapers for several years and that now continues to produce them without Leapers' permission, and (3) founded Trarms for the purpose of selling the knock-off scopes after Leapers terminated their relationship.

The significance of the testimony that Trarms refuses to give is detailed in Tina Ding's Rule 56(d) declaration (Dkt. #81 ¶¶3-7, PgID 3759-62). There is ample reason to believe that, if required to meet their discovery obligations, Trarms and Shi would be forced to concede certain facts that undercut almost every factor relevant to the legal arguments raised in their summary judgment motion. For example, relevant to secondary meaning, Shi is uniquely positioned to testify on whether he (and, by extension, all Defendants) intentionally copied Leapers' trade dress—which, as explained below, can, by itself, prove secondary meaning. He can also speak to the exclusivity, length, and manner of Leapers' use of the trade dress (which is also relevant to secondary meaning), as well as the non-functionality of the trade dress. He has so far taken the Fifth Amendment on each topic, Counterfacts ¶15, and Leapers' motion concerning that plea is pending.

Further, it is inequitable in the extreme for Trarms to submit documents in support of its motion while at the same time refusing to answer questions (whether through Shi, Qian Zhang, or anyone else) about those documents.[7] At the very least, as explained in the pending motions to compel, Leapers is entitled to cross-examine and take discovery from its opponent before the issues in the case can be considered ripe for resolution.

### 2. The Adverse Inferences Created By the Assertion of the Fifth Amendment Reinforce the Existence of Genuine Issues of Material Fact

As Leapers has explained in support of its motion to compel Shi's testimony, the fact-finder may—as a matter of law established decades ago by the United States Supreme Court—draw an adverse inference against a party who pleads the Fifth Amendment privilege in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). This remains true even when the resulting consequences are severe, such as when it results in summary judgment being entered against the party claiming the privilege.[8] *See, e.g.*, *SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998). The issues on which Shi (individually and on Trarms' behalf) refused to testify include the secondary meaning and functionality issues raised by Defendants' summary judgment motion. Counterfacts ¶15. Consequently, the jury in this

---

[7] Tabs P-V in Defendants' Appendix are Trarms documents on which Shi refused to testify, (Shi Dep. 43-44, App. 1933). He also refused to testify on any other discovery responses or documents Trarms has produced, (Shi Dep. 77, App. 1942), and such testimony may reveal admissions or other weaknesses in Trarms' arguments.

[8] Several courts have shifted the burden of proof to the party asserting the Fifth Amendment. *See Covelo*, 139 F.3d at 677-78 (collecting cases). Here, that would mean that Defendants would bear the burden of disproving the secondary meaning in, and non-functionality of, Leapers' trade dress.

case will be permitted to infer from Shi's refusal to testify that he would have admitted (directly and/or as to the constituent factors of the legal analysis) that Leapers' trade dress has secondary meaning and is non-functional. Therefore, logic compels the conclusion that Shi and Trarms have foreclosed the option of receiving judgment as a matter of law on issues as to which they themselves refuse to testify.[9]

## B.    A Reasonable Jury Could Easily Hold That Leapers' Trade Dress Has Secondary Meaning

### 1.    A Secondary Meaning Determination Requires the Fact-Finder to Make Discretionary Balancing Judgments Unsuited for Summary Judgment

As Defendants correctly observe, the Sixth Circuit "applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2006).

As the Sixth Circuit has repeatedly held but Defendants did *not* acknowledge, however, "[n]o single factor is determinative and every one need not be proven." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 528 (6th Cir. 2013). Moreover, because "[d]irect proof of secondary meaning is difficult to obtain … the Court must [expect to] draw reasonable inferences from evidence …." *Burke-Parsons-Bowlby*

---

[9] At a bare minimum, the availability of this inference should greatly reduce the amount of additional evidence needed to show the existence of a genuine issue of material fact.

*Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). The process of parsing each of these separate factors, deciding which of them are important here, and weighing their relative significance is a fact-intensive exercise of judgment by the finder of fact. Therefore, this issue "generally should not be decided at the summary judgment stage." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002); *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162 (2d Cir. 1991) ("The careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment"); 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:119 (4th ed.) ("Courts often deny a motion for summary judgment on the ground that the existence or nonexistence of secondary meaning can only be determined at a full fact-finding trial.")

### 2.   Leapers' California Registration Demonstrates Distinctiveness

The State of California scrutinized Leapers' application to register the trade dress just as closely and by the same standards as the USPTO does, including with respect to whether Leapers' trade dress is distinctive in the marketplace, and ultimately agreed to register the trade dress. Counterfacts ¶22. This is an administrative determination of secondary meaning, and is persuasive authority that deserves respect. At a minimum, it creates a material fact question on secondary meaning.[10]

---

[10] *See, e.g.*, *Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*, 359 F. Supp. 2d 561 (E.D. Ky. 2004) ("This court will give the same deference to the state registration as it would to the federal registration and finds that the defendant has failed to argue persuasively that the mark was ineligible for protection").

6

3.    **Defendants' Copying of the Trade Dress Was Indisputably Intentional,**
      **Which By Itself Creates a Presumption of Secondary Meaning**

     *a.*    *Intentional Copying Raises a Presumption of Secondary Meaning*

Defendants completely gloss over this factor, other than to misrepresent Leapers'

allegations[11] and overstate a stray line of testimony.[12] Yet the Sixth Circuit "has long held

that evidence of intentional copying shows the strong secondary meaning of a product

because there is no logical reason for the precise copying save an attempt to realize upon a

secondary meaning that is in existence." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle*

*Outfitters, Inc.*, 280 F.3d 619, 639 (6th Cir. 2002) (quotation and brackets omitted); *see*

*Ferrari S.P.A. v. Roberts*, 944 F. 2d 1235, 1239 (6th Cir. 1991) ("evidence of intentional

copying shows the strong secondary meaning of the … designs"); *Goscicki v. Custom Brass*

*& Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 754 (E.D. Mich. 2002) (following *Ferrari* to

hold that "intentional copying of trade dress raises a presumption of secondary meaning

which may be rebutted only by showing an alternative logical reason for copying.")

---

[11] Citing Pg. ID 1-15, Defendants assert that Leapers "failed to allege that Defendants intentionally copied its trade dress." Brief at 28-29. That statement is false. *See* Complaint ¶29, Pg. ID 5 ("Defendants have willfully and intentionally manufactured, produced, advertised and/or sold products bearing the Leapers marks with knowledge that the Leapers marks are owned by Leapers"); *id*. ¶32, Pg ID 5 ("Defendants used the Leapers marks with the intent to confuse and/or deceive consumers"); *id*. ¶61, Pg ID 9 ("Defendants, with knowledge of and with intentional disregard for the rights of Leapers, manufactured, produced, advertised and/or sold items using the Leapers marks or confusingly similar imitations thereof") (all emphasis added).

[12] Defendants' deposition questions on the cited pages App. 349-50 are ambiguous. All that Leapers' representative can be fairly read as saying in response is that she does not have first-hand knowledge of Defendants' state of mind. T. Ding Dec. ¶10 (Pg ID 3764-65).

*Innovation Ventures, LLC v. N2G Distrib., Inc.*, 779 F. Supp. 2d 671, 678 (E.D. Mich. 2011) ("evidence of intentional copying [was] so clear in this particular case that Plaintiff's mark [was] afforded secondary meaning.")

### b.  Shi's Long-Time Role as Leapers' Supplier, and His Disregard of Leapers' Specific Instructions, Makes His Intent Obvious

Shi's WuYang and LongTian factories supplied Leapers scopes from 2004 until Leapers terminated the relationship in 2011. Counterfacts ¶¶7-9. Not coincidentally, Trarms and SMTS began selling, and Sun began sourcing from LongTian, their accused scopes in 2012.[13] Counterfacts ¶12. These scopes are, from all external appearances, replicas of the Leapers scopes WuYang and LongTian previously made for Leapers. *Id*. They are also manufactured by WuYang and/or LongTian (which uses the same Chinese address as WuYang). The corporate representatives of SMTS and Sun both confirmed this, Counterfacts ¶11, which is an admission that *all* Defendants—including Sun—intentionally sold copies of Leapers' trade dress. In light of these facts, Defendants cannot seriously maintain that they did not intentionally copy Leapers' scope designs.

Moreover, Trarms and Shi claim in this lawsuit that it was Shi, not Leapers, who created the trade dress design. Counterclaims ¶9, Pg ID 570. Leapers vehemently denies this, but it is further evidence that Shi intended to personally commercialize this design.

---

[13] Other than the "Shorty 40" scope, Model CSP26, which is discussed below.

### c.   <u>Shi's Apparent Forgery of Documents Shows His Bad Intent</u>

Indeed, Shi is apparently so intent on claiming credit for Leapers' trade dress that he appears to have forged documents for the purpose of advancing this argument. Counterfacts ¶14. Case law is legion that "if [a party] falsifies … relevant evidence, such conduct may be taken as an admission that the true facts would defeat the position the party is seeking to maintain." *U.S. v. Philatelic Leasing*, 601 F. Supp. 1554, 1566 (S.D.N.Y. 1985).[14] These incidents further cement the inevitable conclusion that Trarms and Shi had every intention of copying Leapers' trade dress.

### d.   **Defendants' Wholesale Copying of**
### **Leapers' Product Documentation**

Defendants' copying extends not only to Leapers' scope designs, but also to the product documentation included in the scope packaging. At least some documents that currently ship with the Sniper and Sun scopes produced at LongTian are exact replicas of the user manuals and other materials that WuYang printed and included with Leapers' scopes, Counterfacts ¶13, despite Leapers' express instruction in 2011 to stop use of Leapers' printed materials. *Id*. ¶9. This is still further evidence of intentional copying.

---

[14] *See also* 2 WIGMORE ON EVIDENCE § 278 (Chadbourn rev.1979) ("It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit").

### e.    *Shi Appears to Have Previously Counterfeited Leapers Scopes*

A 2010 Leapers investigation concluded that Shi and WuYang were selling counterfeit Leapers scopes. Counterfacts ¶16. Leapers continues to investigate other counterfeits, several of which may be tied to WuYang. T. Ding Dec. ¶8 (PgID 3762-63).

### 4.    Defendants Ignore the Copious Amount of Direct Consumer Testimony Verifying That Leapers' Trade Dress Has Secondary Meaning

Unless one parses very finely Defendants' word choices on page 13 of their Brief, one would understand Defendants to be saying that Leapers has not produced direct consumer testimony validating its claim to secondary meaning. That impression would be profoundly incorrect. To the contrary, Leapers has already produced several sworn declarations from both distributors and end users, all of whom testified that they associate the trade dress with Leapers. App. 2147-76.[15] Defendants' failure to even acknowledge the existence of these declarations in motion papers seeking summary judgment on secondary meaning further undercuts the credibility of the motion. The substance of the declarations substantially bolsters Leapers' arguments.

### a.    *Eight Sworn Declarations Confirm Secondary Meaning*

Michael Davis, Shane Coe, Eric Miller, and Rodd Rambo each own(ed) and/or operate(d) retail businesses in the firearms industry for decades, and sell (or have sold) Leapers scopes for many years. Each of them executed declarations verifying that Leapers

---

[15] All of these except the Rambo Declaration (App. 2156-60) were produced before Defendants filed their motion.

has been using the trade dress in commerce since approximately 2003, that it is "distinctive in the firearms scope industry," that it "indicates [to them] that Leapers is the source of that scope," and that they "believe that many of [their] customers would say the same." App. 2148 (Davis ¶6), 2154 (Miller ¶6), 2151 (Coe ¶6), 2160 (Rambo ¶7). In particular, Rambo noted that "customers often identified Leapers scopes by their visual appearance, and the scalloping design is the most visually distinctive aspect of the scopes." App. 2160 ¶7. Each of these witnesses personally interact with hundreds, if not thousands, of firearms customers, and are therefore well-positioned to give this testimony.

Tom Gaylord has first-hand experience helping several companies (including Leapers) design firearm accessories, and is a prominent author and commentator in the field. App. 2161-62 ¶¶3-4. He also verifies that Leapers has been using the trade dress in commerce since approximately 2003, that it is "distinctive in the firearms industry," that it "indicates [to him] that Leapers is the source of the scope," and that he "believe[s] that many other scope users would say the same." *Id.* ¶6.

Chad Rousse is a New Hampshire resident and a lifelong hunter who is "very familiar with firearms in general and with virtually all brands of rifle scopes in particular." App. 2165 ¶3. In mid-2013, Rousse purchased a SNIPER-branded scope on Amazon, believing it to be a Leapers scope. "The ***primary things*** that led [him] to this conclusion were the indentation patterns along the parallax adjustment ring and near the eyepiece; [he] recognized this as being a unique design that signified Leapers/UTG in [his] mind." App. 2166 ¶5 (emphasis

11

added). Only after he received his order did he realize the SNIPER scope was not a Leapers product.[16] *Id.* ¶7.

Lisheng Zheng and Hongtao Cheng are Chinese nationals who helped Leapers launch its trade dress. They, too, perceive the design as being "distinctive" in the marketplace. App. 1909-10 (Zheng ¶9), 1919 (Cheng ¶6).

These witnesses (whose testimony Defendants ignore) provide compelling, sworn evidence that Leapers' trade dress has secondary meaning among customers.

### b.    *The Alleged First Sale Date of the Shorty 40 Scope Is Insignificant*

#### i.    Defendants Overstate the Applicable Legal Rule

Defendants attempt to evade all of Leapers' consumer testimony through a convoluted chronology that proves far too little. It is premised on one sentence of one opinion, to wit: "Secondary meaning must be established prior to others use of a similar name." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2nd Cir. 1980)). The *Saratoga* opinion, however, adds more context to the quote; it explained that the plaintiff there "could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired." *Saratoga*, 625 F.2d at 1043. In other words,

---

[16] Not only is this clear evidence of secondary meaning, but it (and copious other testimony like it in the record) is also powerful evidence of actual confusion that will weigh heavily in Leapers' favor on the issue of likelihood of confusion. Evidence like this—as well as the exactitude with which Defendants copied Leapers' design—explains why Defendants chose not to dispute likelihood of confusion at this stage.

applied here, it means that Leapers cannot enforce its trade dress against a design used in commerce consistently since before its mark gained secondary meaning. It does not follow, however, that Leapers could not still enforce its rights against other models that came later—especially where, as here, those subsequent models are exact replicas of Leapers' trade dress, while the earlier model is not.[17]

## ii.  Defendants Have No Evidence to Support Their Argument

Whenever Leapers' trade dress obtained secondary meaning, Defendants identify only one of the more than 50 scopes at issue in the case that could even conceivably predate it. That is Sun's model CSP26, a.k.a. the "Shorty 40." According to Defendants, a third party company called B Square sold this model from 2004[18] through at least 2007, when Sun began carrying it. This assertion, however, is based on nothing other than a single page of deposition testimony from Sun's representative. App 1302. That falls far short of the evidence needed to conclude that the facts recited by the witness are accurate. At best, this line of argument is one for the jury, not summary judgment.

## iii.  Every Other Accused Scope Is Far More of an Infringement

There are clear distinctions between Leapers' trade dress and the relevant design elements of the Shorty 40:

---

[17] Identifying definitive evidence of the exact moment in time when a design acquired secondary meaning in consumers' minds is difficult, although Leapers' declarations show that it has been well-established for years, before Defendants recently knocked it off.

[18] This is still two years after Leapers created its trade dress, by which time the trade dress could be found to have obtained secondary meaning.

**Sun's Shorty 40**                              **Analogous Leapers Scope**



For example, the grooves on the front (objective), rear (diopter), and top (turret) of the Shorty 40 are different from those on the power ring (between the turret and diopter). In Leapers' trade dress, the design is consistent. Moreover, although the power ring resembles Leapers' scalloping, the texturing on the other adjustments is narrower. Although Leapers initially identified this model as potentially confusingly similar to its trade dress, Leapers acknowledges that this scope model is far less of a concern than the remaining accused scopes. Therefore, Leapers will no longer assert that the Shorty 40 is an infringement.

It must be reiterated, however, that virtually every other model of accused scope is nearly identical in relevant appearance to pre-existing Leapers models. Counterfacts ¶12. Defendants admit that they did not begin selling these scopes until 2011-12, at least nine years after Leapers' trade dress had been on the market.

14

    **5.**    **The Parties' Competing Consumer Surveys Create a "Battle of the Experts" That Must Be Resolved by the Jury**

        *a.*    *Surveys Are Neither Dispositive Nor Proper to Weigh at the Summary Judgment Stage*

To be sure, the Sixth Circuit "has historically favored the use of consumer surveys as proof of secondary meaning." *Gen. Motors Corp.,* 468 F.3d at 419. The court has clarified, however, that "[s]urvey evidence is not the only relevant evidence" and it is possible to "present[] sufficient evidence of secondary meaning at summary judgment without consumer surveys." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 312-13 (6th Cir. 2001).

Here, both Leapers and Defendants present their own survey experts, each of whom conducted consumer surveys and came to opposite conclusions regarding whether Leapers' trade dress has secondary meaning. App. 793, 1684. Such "competing expert opinions present the 'classic battle of the experts' and it is up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (internal quotation omitted) (reversing grant of summary judgment where "the magistrate judge engaged in an extensive analysis of the parties' expert reports and found [one expert's] conclusions more credible"). "[W]eighing the credibility of the competing expert reports amounts to improper fact-finding." *Id*., citing *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 449 (6th Cir. 2002).

15

### b.    *The Kupritz Survey Rebuts Defendants' Survey Results*

To the extent the Court considers the parties' respective survey results at all at this stage, it must construe them in the light most favorable to Leapers. Defendants claim that their survey by Dr. Jukam demonstrates a lack of secondary meaning. Among the many flaws in Jukam's survey, however, is that its relevant sample is actually less than half of what he claims it to be. He acknowledged that the number of respondents who said they would be somewhat likely or very likely to purchase a scope in the future is really 194 out of 412, or 47% of the total surveyed. App. 2178 (Jukam Dep. at 37:3-4.) He also admitted that this reduction in valid participants to below 200 people increases the survey's margin of error substantially. App. 2179 (*Id*. at 73:4-15.)

Defendants also fail to mention the most relevant components of the *three* surveys that Riva Kupritz performed for Leapers. They note that few respondents in Kupritz's *first* survey were able to *name* the source of Leapers' scope, but that is not the test. "[T]he law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an anonymous source." *Herman Miller, Inc. v. Palazzetti Imps. & Epps., Inc.*, 270 F.3d 298, 315 n.7 (6th Cir. 2001); *Blockbuster Entm't Grp. v. Lazlo, Inc.*, 869 F. Supp. 505, 509 (E.D. Mich. 1994). Kupritz' s third survey—which Defendants ignore—showed that, "[a]fter viewing images of Leapers scopes side by side without any brand identification visible, 61% correctly stated that they were made or put out by a single company." App. 793. This is strong evidence of secondary meaning.

16

**6.      Leapers Has Strong Evidence With Respect to**
       **Exclusivity, Length, and Consistency of Use**

Defendants' arguments regarding this factor go, at most, to weight, and thus to the

jury's discretion. That said, none of Defendants' arguments are particularly strong, either.

***a.      The Existence of Allegedly Older and***
       ***Arguably Similar Designs Proves Nothing***

Defendants identify scope models from two manufacturers—Tesco and Bushnell—

that they say were sold prior to the introduction of Leapers' trade dress in 2003. But this

fact, even if true, is insignificant. Defendants have never even suggested, let alone proved,

that these models have been sold in interstate commerce *consistently*, which is necessary

to obtain any trade dress rights in them. The fact that the designs may have appeared on

the market for a brief moment and disappeared is of no moment to the rights that Leapers

has continuously nurtured since 2003. Trade dress rights are distinct from patent rights in

that they are premised on commercial distinctiveness, not on novelty. Any implication that

Leapers somehow copied these designs is disproven by the above-cited witnesses.[19]

Moreover, neither these nor the other *arguably* similar scope designs that

Defendants cite have the same overall design as the Leapers trade dress. Although each

model may have grooves along their adjustment knobs they are not necessarily applied

---

[19] Leapers' expert Peter Kokalis' testimony is not to the contrary. He did not testify that
Leapers copied Tasco's trade dress, only that it would "seem that way" based on the limited,
hypothetical facts presented to him by counsel. Kokalis did not have or profess to have and
first-hand knowledge on the subject, and has since clarified that he did not intend to express
an opinion on that subject one way or another. Dec. of Peter Kokalis ¶9 (Pg ID 3774).

consistently over the entire scope, nor do they have the same wave-like scalloping and uniform proportionality between the peaks and valleys of those waves—all of which are elements of Leapers' trade dress. Whether and to what degree any of these designs approximates or is meaningfully similar to Leapers' trade dress, and the significance of that similarity to Leapers' rights, is for the jury to decide after a careful analysis.[20]

### b. Even if Third-Party Designs Were Relevant, Leapers Has Distinguished Its Design From Them

Even if it were proper for the Court to evaluate the alleged similarities of these third-party designs to Leapers' trade dress, Leapers has produced substantial countervailing evidence. Expert witness Peter Kokalis included a number of photographs of third-party scopes in his expert report, for the purpose of demonstrating that, by comparison, "Leapers['] riflescopes have the most distinctive trade dress of any of the more than one hundred different riflescopes I have personally examined, tested, written about, and deployed with in combat in the last thirty-four years." App. 2188 (Kokalis Report ¶15.) Each of the declarants cited above likewise testified to the distinctiveness and secondary meaning of Leapers' trade dress despite—or, rather, because of—their familiarity with other scope brands. This is more than enough to raise genuine issues of fact.

---

[20] The fact that Defendants attempt here to use the visual observations of their "expert," Emanuel Kapelsohn, to supplant the jury's prerogative of visually inspecting the evidence for itself underscores the argument in Leapers' pending *Daubert* motion that it is not "expert" testimony at all.

18

### c.  *Even if Third-Party Designs Were Relevant, Defendants Have Waived the Argument By Failing to Support It*

Defendants have done nothing more than laundry-list the names of manufacturers without making any effort to explain why each model is cognizably similar to Leapers'. Brief at 20. What is more, although Defendants chide Leapers' representative, Ms. Ding, for declining to be specific on the details of these third-party designs, Brief at 26-27, the documents that Defendants cite at App 366-424 (which are the same documents they asked her to testify on) demonstrate the basis for her caution. These are nothing more than grainy, blotchy reproductions of website print-outs, yet Defendants demanded that Ms. Ding make detailed comparisons under oath based only on these indecipherable images. *See also* App. 2211 (Kokalis at 100, making same complaint about same images). Notably, one of Defendants' "expert" witnesses likewise refused to testify about an image he found too imprecise, App. 2217-19 (Kapelsohn Dep. at 132-37), and also testified that website images of scopes *categorically* lack sufficient detail for a visual comparison. App. 2217 (*Id*. at 131).

### d.  *Leapers' White-Label Scopes Still Originate From a Single Source*

Defendants claim that Leapers used its trade dress "inconsistently" because it allowed Crosman and Eastman to sell Leapers scopes under their own brand names (a "white label" arrangement). This misconstrues trademark law. As noted above, secondary meaning is an association with a single source; consumers need not know the name of that source. Nor is there any requirement that trade dress be sold under only one brand name.

Moreover, Leapers has produced (and Defendants have ignored) evidence rebutting this suggestion. In his declaration, Tom Gaylord testified

> "[b]ecause of that [trade dress] design, I could instantly recognize the fact that Leapers produced those [Crosman]-branded scopes. And if I had encountered one of these 'Sniper' scopes for the first time in a retail context, I would have bet money that the scope had been sourced by Leapers." (App. 2164 ¶9).

Confused consumers Chad Rousse and Robert Goldstein likewise testified that, when they purchased "Sniper" scopes, they initially assumed that "Sniper" was simply another brand name used by Leapers, in addition to its UTG and ACCUSHOT lines. App. 2166 (Rousse ¶7), 2441(Goldstein ¶8). The same logic applies to the Crosman and Eastman brands.

### e. _Alleged Variations in the Trade Dress_

Defendants complain that the dimensions of the scallops in Leapers' trade dress vary between specific adjustment knobs on any given scope, because the components to which they are applied are different sizes. What they do not explain is why that matters. The key to the trade dress is uniformity in appearance, not in the size of different scope components. Obviously, the parallax adjustment, turrets, diopters, and other components will be different in absolute size, but the overall uniformity and proportionality of the scalloping remains visually consistent across the scope. Counterfacts ¶3.

Defendants also note that some iterations of Leapers' trade dress have scallops that are slightly less rounded and "edgier" than analogous models sold a decade ago.[21] Some of these examples are due to inevitable variations in the manufacturing process, App. 1876 (D. Ding Dep. at 87); others were intentional design choices. But courts have long recognized that "trademark users ought to be permitted to make certain modifications to their marks over time without losing priority." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. _, *slip op.* at 1 (Jan. 21, 2015). This understanding informs the doctrine of "tacking," which "provide[s] that, in limited circumstances, a party may clothe a new mark with the priority position of an older mark…. [T]acking [is] available when the original and revised marks are 'legal equivalents' in that they create the same, continuing commercial impression." *Id.* "Because the tacking inquiry operates from the perspective of an ordinary purchaser or consumer, [the Supreme Court recently held] that a jury should make this determination." *Id.*

Leapers has long made clear to Defendants that it would rely on tacking to establish a continuity in trade dress rights between each iteration of the design. App.1842, 2273. It has also shown that, even with these minor variations, Leapers' scopes convey "the same, continuing commercial impression." More than one of its declarants have testified to this very fact, App. 2156-58 (Rambo ¶¶4-5); 2147-48 (Davis ¶¶5-6); 2150-51 (Coe ¶¶5-6); 2153-54 (Miller ¶¶5-6); 2162-63 (Gaylord ¶¶5-6), as has one of Leapers' expert witnesses. App.

---

[21] Notably, the word "rounded" appears nowhere in Leapers' description of its trade dress in Dkt. #36. The scallops comprising the trade dress are "wave-like," *id.*, but "waves" can be rounded, completely square, App. 2337, or anywhere in between.

21

2188-92 (Kokalis Report ¶16); Kokalis Dec. ¶¶1-8 (Pg ID 3771-74). Likewise, the images used by Leapers' survey expert to establish secondary meaning included various models with differing degrees of convexity in the curves of their scallops. App. 801, 808-30.

### 7. Genuine Issues of Material Fact Exist Regarding Leapers' Sales, Customers, Market Position, and Advertising

Defendants understate this evidence. They list the number of Leapers' direct customers, for example, without acknowledging that these are *businesses*—*i.e.*, distributors and retailers. App. 1881 (D. Ding. Dep. at 169). The number of end-user consumers to whom these customers sell Leapers' scopes, therefore, is exponentially greater.[22]

Moreover, although Leapers has not used a "TM" symbol with its trade dress or used words to highlight the trade dress, the design is instantly visible on the exterior of the scopes, which themselves are often prominently displayed in ads, and have been since at least 2003. App. 2220-69. By necessity, this draws attention to the trade dress. As explained above, Defendants' criticism that Leapers' representative could not identify the trade dress in ads is disingenuous, because Defendants intentionally handed her poor reproductions in her deposition. The "former employees" to whom Defendants refer here work either for Defendants or for Lion Gears, whose principals, like Mr. Shi, face criminal charges in Indiana for counterfeiting Leapers' scopes.[23] Their statements are self-serving.

---

[22] Contrary to Defendants' assertion, Leapers has, in fact, endeavored to demonstrate its sales figures for scope models bearing the trade dress.

[23] The Indiana charges are serious, as shown by the conviction of Henry Zhang for counterfeiting the same types of Leapers scopes. Counterfacts ¶19.

In sum, the record contains ample evidence to create factual questions on secondary meaning that may only be resolved by the jury.

**C.    A Reasonable Jury Could Easily Hold That
Leapers' Trade Dress Is Non-Functional**

**1.    Functionality Only Exists Where the Designer's Subjective Motivations
Are Driven By Functional Considerations**

"A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 155-56 (6th Cir. 2003). This necessarily requires a somewhat subjective inquiry into whether "engineering necessity influenced the configuration of the functional components." *Id*. at 158. "In other words, the question is whether the overall shape of [Plaintiff]'s [product design] was substantially influenced by functional imperatives or preferences." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 506 (6th Cir. 2013). The law

> "distinguish[es] *de facto* functional features, which may be entitled to trademark protection, from *de jure* functional features, which are not. In essence, *de facto* functional means that the design of a product has a function, *i.e.*, a bottle of any design holds fluid. *De facto* functionality does not necessarily defeat registrability. *De jure* functionality means that the product has a particular shape because it works better in this shape."

*Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc*., 461 F.3d 675, 685 (6th Cir. 2006) (quotes omitted). In *Ferrari S.P.A. v. Roberts*, the Sixth Circuit found trade dress non-functional based on testimony that "the company chose the exterior designs for beauty and distinctiveness, not utility." 944 F.2d 1235, 1246 (6th Cir. 1991). And in *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 417 (6th Cir. 2006), the court concluded that the

23

automotive design features in question were not influenced by functional considerations, crediting the testimony of a General Motors manager to the effect that the Humvee's performance specifications dictated certain dimensions, but not the vehicle's "exterior appearance and styling," including its "grille, slanted and raised hood, split windshield, rectangular doors, [and] squared edges," elective features that did not perform any function.

Applied to these facts, the issue for this Court to decide is not whether scope adjustment knobs, knurling in general, or even the specific scallops that constitute Leapers' design are capable of being put to a functional use.[24] The doors, hoods, and other vehicle components at issue in *Ferrari* and *General Motors* were certainly capable of performing functions, as is the quintessential example of product configuration trade dress, the Coca-Cola bottle. Rather, the question is whether Leapers chose its *specific* design to make its scope adjustments *more* functional—which several lines of evidence show is not the case.

## 2.   Multiple Witnesses Attest That the Design of Leapers' Trade Dress Was Driven Solely By Aesthetic, Not Functional, Considerations

Leapers' co-founder David Ding was the leading creative force behind the design of what became Leapers' trade dress. He has consistently testified that functionality played no role in his design choices; instead, the purpose of the trade dress was to create a distinctive, aesthetic look. D. Ding Dec. ¶¶4-5 (Dkt. #82, PgID 3769). It is significant to recall that one element of the trade dress is that all the scalloping present on any particular scope is consistent in appearance across the scope. This serves no purpose other than aesthetics.

---

[24] This renders most of Defendants' proffered functionality "expert"'s testimony irrelevant.

24

Two individuals who worked closely with Mr. Ding during the period of time in which he designed the trade dress have each verified that the design was driven by aesthetic, and *not* functional, considerations. App. 1909-10 (Zheng Dec. ¶9); App. 1919 (Cheng Dec. ¶6). Likewise, industry veteran Rodd Rambo

> "understand[s] this design to perform an aesthetic, and not a functional role. I have used these scopes for many years, and I have no reason to believe that Leapers' particular scalloping design adds any additional grip to an adjustment knob—and certainly not compared to narrow-cut knurling like Leopold's." App. 2158 (Rambo ¶6).

Leapers' expert witness Peter Kokalis reached the same conclusion based his extensive knowledge of the scope market. App. 2208 (Report ¶19) ("Leapers clearly chose its trade dress to set it apart from other companies rather than for a utilitarian purpose"). Both Kokalis and David Ding testified that, if Leapers had intended to improve grip on the scopes, it would have used a different design. *Id*.; D. Ding Dec. ¶4 (PgID 3769).

### 3.    Leapers' California Registration Demonstrates Non-Functionality

A federally registered trade dress is presumed to be non-functional. 15 U.S.C. §1125(a)(3). This is an act of deference to the USPTO, which does not grant registration until it examines the functionality question for itself. California applied the same standards to Leapers' application[25] and agreed to register the trade dress. Counterfacts ¶22. This is an

---

[25] California courts recognize that "one of the main theories in trade dress litigation is that you can't 'own' trade dress that is functional." *U.K. Abba Prods. v. Employers Ins. of Wausau*, 2002 Cal. App. Unpub. LEXIS 8277, *23 n.6 (Cal. App. 4th Dist. Aug. 29, 2002).

administrative determination of non-functionality, and is persuasive authority that deserves respect. At a minimum, it creates a material fact question on functionality.

It is also instructive to note that—as the USPTO's initial allowance of Leapers' application suggests—designs on scope adjustments *are* capable of obtaining federal trade dress registration. The USPTO granted registration to a "Nightforce" scope design, Counterfacts ¶20, reversing an initial determination of functionality after Nightforce argued its design was only *de facto*, not *de jure*, functional. App. 2420-34. Even Defendants' "expert" agrees that some "knurling" designs on scope adjustments can be non-functional. App. 2212-19 (Kapelsohn Dep. at 38-39, 105, 111,137-38).

### 4.    Defendants Offer Nothing But *Ipse Dixit* and Disagreement in Response

Defendants and their "expert" repeatedly assert that ribbing/texture/knurling is necessary in order to grip a scope adjustment, but offer little more than their own say-so as evidence. *See* Dkt. #77. They do cite certain references to "finger adjustments" in Leapers manuals as "admissions" of functionality, App. 530-31, 533, 1516-19, but should know better after the testimony of Tina Ding and their own "expert" that these passages describe an entirely different, internal scope component.[26] App. 1902-05 (T. Ding Dep. 274-85); App. 2214 (Kapelsohn Dep. 74-75). The parties' experts also disagree as to whether the size of some components narrows the available range of designs, App. 2210 (Kokalis Dep. 94), although the answer is irrelevant to whether Leapers intended its design to be functional.

---

[26] Other advertising statements to which Defendants point are either highly ambiguous, App. 529 ("user-friendly"), 1517 ("ergonomic") or irrelevant. App. 1518 (external accessory).

Defendants' other sources of evidence are unpersuasive. They offer unsworn, online comments about functionality by unknown authors for their truth, App. 1457-83, but that is inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801(c), 802. Several form declarations from mid-Michigan "firearms enthusiasts" express their (lay) opinions about the design's functionality, App. 1522-28, but these suffer the same flaws as Defendants' "expert" report. Finally, Defendants claim that Leapers' "former employees" confirm functionality, yet the cited evidence is to Leapers' President Tina Ding (who said no such thing), App. 289.2-293, and John Xie, who now works for Lion Gears, a company that sells Trarms' Sniper scopes, App. 1969 (Xie Dep. 23), and whose principals are facing the same Indiana criminal counterfeiting charges as Mr. Shi. Xie is an IT technician who had no design role at Leapers. App. 1778-81. None of Defendants' evidence diminishes the existence of genuine factual issues as to the non-functionality of Leapers' trade dress.

### 5. Shi's Chinese Design Patent Application Raises Questions About Whether the Trade Dress is Non-Functional

A design patent covers aesthetic designs. Shi (and/or LongTian acting at his behest) filed an application to register a design patent in the trade dress in China. Counterfacts ¶14. Leapers disputes Shi's right to do so, but the application nevertheless suggests that Shi considers the design to be non-functional. App. 2435-36 (Chinese Patent Examination Guide). Shi was asked exactly that question and pled the Fifth Amendment. App. 1932-33 (Shi Dep. 40-43). That raises a fact question as to functionality.

**D.**    **Leapers' Remaining Causes of Action Survive for the Same Reasons**

Leapers agrees that its remaining claims are governed by the same legal standards as its trade dress claim—including its claim under Lanham Act §43(a). *See Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992) (Stevens, concurring). All of the foregoing analysis proves why these claims likewise survive summary judgment. Defendants waive their argument for canceling Leapers' state registrations by devoting to it only a single paragraph with no explication. Each registration was issued under a different state law. Trademark laws differ between states on relevant aspects like the grounds for cancellation or the presumptions afforded a registration. Self-evidently, the existence of fact questions on Leapers' federal claims forecloses such relief. Nor do Defendants explain why this is "a court of competent jurisdiction" under multiple state laws that Defendants merely string-cite.

## IV. Conclusion

For all of the foregoing reasons, Leapers respectfully requests that the Court DENY Defendants' motion for summary judgment.

Respectfully submitted,

Darlene R. Seymour
1292 E. 91st Street
Indianapolis, IN 46240
dseymour@ce-ip.com

Michael A. Lisi
BRIDGE I.P. SERVICES PLLC
27332 Woodward Avenue, Suite 200
Royal Oak, MI 48067
248-284-0900; mlisi@bridgeip.net

/s/ Brian D. Wassom
Brian D. Wassom (P60381)
Jeremy D. Lockhart (P76500)
HONIGMAN MILLER SCHWARTZ & COHN LLP
39400 Woodward Ave., Suite 101
Bloomfield Hills, MI 48304
248-566-8490;
bdw@honigman.com

*Attorneys for Plaintiff Leapers, Inc.*

28

## CERTIFICATE OF SERVICE

Karen Larson certifies that she is employed by the law firm of Honigman Miller Schwartz and Cohn LLP, and that on May 26, 2015, served a copy of the foregoing document via the Court's ECF filing system to all counsel of record.


*/s/ Karen Larson*
Karen Larson