# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAPERS, INC.,

        Plaintiff,

v.                                      Case No. 14-12290

SMTS, LLC d/b/a TUFF ZONE et al.,

        Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now before the court is Defendants' Motion for Summary Judgment, seeking dismissal of Plaintiff's claim for trade dress infringement under § 43(a) of the Lanham Act.[1]  The matter is fully briefed, and the court finds that a hearing is unnecessary. *See* E.D. LR 7.1(f)(2).  For the reasons stated below, the court will grant Defendants' Motion.

## I.  BACKGROUND

Plaintiff Leapers has been manufacturing rifle scopes since it was founded in 1992, and currently sells its products under the UTG and ACCUSHOT brands.  (Dkt. # 67, Pg. ID 1015.)  In its Complaint, Plaintiff claims to own "common law trade dress rights in the distinctive scalloping design applied to the adjustment knobs and bells of its rifle scopes and/or sights."  (Dkt. # 1, Pg. ID 4.)  The company has been unsuccessful in

---

[1] Defendants also seek summary judgment on Plaintiff's claims of (1) false designation of origin under § 43(a) of the Lanham Act, (2) common law trademark infringement, (3) unfair competition, (4) violation of M.C.L.A. § 492.42, and (5) violation of the Michigan Consumer Protection Act.  All parties agree that these additional claims "are governed by the same legal standards as its trade dress claim." (Dkt. # 84, Pg. ID 3827; Dkt. # 67, Pg. ID 1047.)  Thus a grant of summary judgment on the trade dress claim, necessitates a grant of summary judgment on all other federal and state claims, as well.

registering this trade dress with the United States Patent and Trademark Office
("USPTO") (Dkt. # 84, Pg. ID 3790), but has registered under state law in California and
Michigan.  (*Id.* at Pg. ID 3799.)

Leapers' co-founder and vice president David Ding avers that the company
"began the design process that led to the trade dress" in question in 2000.  (Dkt. 84, Pg.
ID 3791.)  These newly-designed rifle scopes were first manufactured two years later in
the Jinkajin factory in China, and distributed in the United States beginning in February
2003.  (*Id.*)  The following year, Tina Ding, Leapers' other co-founder and president,
purchased a factory in China called Nantong WuYang Sporting Goods ("WuYang").
(*Id.*)  The day-to-day affairs of this factory were run by Chuanwen Shi and his partner
Donghui Yang.  (*Id.*)

In 2006, Shi and Yang entered into an agreement with Plaintiff, which granted
them the exclusive right to manufacture Plaintiff's scopes. (*Id.*)   As part of the contract,
the pair promised to "never disclose any information related to Leapers' products or
client information." (*Id.*)  This agreement continued in force until November 17, 2011,
when Plaintiff ended its relationship with WuYang.  In an email sent to Shi (and others),
Plaintiff instructed the factory to "cease using any and all technical specifications,
product design documents, [and] packaging design documents related to any of
Leapers [sic] products" and to "[d]estroy any and all parts, accessories, attachments,
and the like, related to any of Leapers [sic] products previously produced to fulfill
Leapers's orders."  (*Id.* at 3792 (emphasis omitted).)  Acknowledging the email, the
factory's leadership promised that complying with Plaintiff's demands would be a
priority. (*Id.* at 3793.)

2

The factory now manufactures scopes for several of Plaintiff's competitors including Defendants Trarms, SMTS, and Sun, and in some cases, appear to be using the same designs used in Leapers scopes. (*Id.*) SMTS began selling these scopes in 2011, and Sun began selling them the following year, (*Id.* at 3794), prompting Plaintiff to commence this suit.

## II.  STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  The movant has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . .

3

credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## III.  DISCUSSION

Defendants claim they are entitled to summary judgment because Plaintiff has not created a genuine issue of material fact with respect to whether the "smooth and continuous wave-like scalloping . . . applied to the adjustment knobs and bells of its scopes" constitute unregistered trade dress protectable under the Lanham Act.  (Dkt. # 67, Pg. ID 1011, 1021 (quoting Dkt. # 36, Pg. ID 516).)

"The Lanham Act, 15 U.S.C. §§ 11501-1141n, encompasses the protection not just of wordmarks and symbols, but also of trade dress." *Goeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.,* 730 F.3d 494, 503 (6th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205, 209 (2000)).  "Trade dress refers to the image and overall appearance of a product.  It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sales." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 629 (6th Cir. 2002) (internal quotation marks, ellipses, and brackets omitted). It "involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques." *Id.* (internal quotation marks omitted).

"To prevail on a claim for the infringement of a product-design trade dress, a plaintiff must prove that its allegedly infringed product design (1) is nonfunctional, (2)

4

has acquired secondary meaning, and (3) is confusingly similar to the allegedly

infringing product design." *Groeneveld* 730 F.3d at 503.  "If the plaintiff fails to present

sufficient evidence for a reasonable jury to find in its favor on any on of these three

elements, then judgment as a matter of law should be entered for the defendant."  *Id.* at

504.

Defendants argue that "Plaintiff cannot meet elements one and two of this test."

(Dkt. # 67, Pg. ID 1021.)

## A. Secondary Meaning

Defendants argue that "Plaintiff's trade dress has not acquired secondary

meaning."  (Dkt. # 67, Pg. ID 1022 (capitalization and bold omitted).)) To establish

secondary meaning, the evidence must show that "in the minds of the public, the

primary significance of the trade dress is to identify the source of the product rather than

the product itself."  *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 (1982).

This is a substantial burden.  *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes,*

*Inc.,* 871 F.2d 590, 596 (6th Cir. 1989).  In making this determination, courts consider

the following seven factors:

(1) direct consumer testimony;

(2) consumer surveys;

(3) exclusivity, length, and manner of use;

(4) amount and manner of advertising;

(5) amount of sales and number of customers;

(6) established place in the market; and

(7) proof of intentional copying.

*Gen. Motors Corp. v. Lanard Toys, Inc.,* 468 F.3d 405, 418 (6th Cir. 2006).

Nevertheless, "[n]o single factor is determinative and every one need not be proven."

*Groeneveld,* 320 F.3d at 528.  Secondary meaning in the current case is a close call.

Plaintiff has provided *some* evidence of secondary meaning, but each piece of evidence

tends to be near the weaker end of the spectrum.

      For example, with respect to direct consumer testimony, Plaintiff has proffered

only five sworn declarations from professional *distributors*, not ultimate consumers, in its

effort to establish that secondary meaning was "established prior to others [sic] first use

of a similar [design]." *Burke,* 871 F.2d at 596. Each stated that Plaintiff was selling

scopes with its alleged trade dress prior to 2004, the date Defendants indicate a

competitor first sold scopes containing the disputed scalloping design. (Dkt. # 67, Pg. ID

1023; *see also* Dkt # 69-27, Pg. ID 2533.)  For example, Michael A. Davis claimed that

> Leapers has been selling scopes with this design, or a materially identical design
> . . . since 2002-2003.  I have come to recognize this design as distinctive in the
> firearms scope industry.  When I see this design on a scope, it indicates to me
> that Leapers is the source of that scope.  I believe that many customers would
> say the same.

(Dkt. # 86-17, Pg. ID 4281.)  The Sixth Circuit has allowed plaintiffs to rely on this

"variety of circumstantial testimony" to link its trade dress to "the mind of the consuming

public," *Herman Miller, Inc. v. Palazzeti Imps. and Exps., Inc*., 270 F.3d 298, 312 (6th

Cir. 2001), especially when, as here, the plaintiff "sold its products primarily through

distributors" making "the relevant class of consumers consist[] of both ultimate

consumers and dealers," *Tenneco Auto. Operating Co., Inc.* v. *Kingdom Auto Parts,*

410 F. App'x 841, 848 (6th Cir. 2010).  Nevertheless, the Circuit has also emphasized

6

that it considers such declarations to be "very weak" evidence and insufficient to create a genuine issue of material fact on their own.  *Id* at 850.

The survey data Plaintiff points to is similarly inconclusive.  Plaintiff's expert performed multiple surveys, the first of which revealed that only 0.5% of participants could identify Leapers as the maker of a scope just by looking at it.  (Dkt. # 69-14, Pg. ID 1973-89.)  This corresponds to the data produced by Defendants' consumer survey, (Dkt. # 69-46, Pg. ID 2862,) and is well below the 26% response rate, which in *Ashland Oil, Inc. v. Olympco, Inc.,* No. , 1995 WL 499466, at *3-4 (6th Cir. 1995), the Sixth Circuit held was "not sufficiently probative to [a] mark's having secondary meaning."

But, Plaintiff argues that "the law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an anonymous source," (Dkt. # 84, Pg. ID 3851 (quoting *Herman Miller,* 270 F.3d at 315 n. 7)), pointing to its expert's third survey, which showed that "[a]fter viewing images of Leapers scopes side by side without any brand identification visible, 61% correctly stated that they were made or put out by a single company."  (Dkt. # 69-24, Pg. ID 2022.)  "[A] high percentage of the respondents believed that the scopes were made by the same company based on the similarities in design covered by the Leapers mark."  (*Id.* at Pg. ID 2023.)

Whether any of Plaintiff's evidence, individually or collectively, amounts to more than a scintilla is difficult to determine. *See* 6 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 32:119 (4th ed.) ("[B]ecause of the intangible and ephemeral nature of secondary meaning, it is sometimes difficult to say that it either exists or does not exist merely on the affidavits in a summary judgment motion.").   The court is

inclined to find that the Plaintiff has furnished enough evidence—barely—to survive

summary judgment on this point.  Nonetheless, the court need not reach a definitive

conclusion because this case turns on other factors.

### B. Functionality

Even assuming that Plaintiff's trade dress has acquired secondary meaning, the

court must still grant Defendant's Motion for Summary Judgment because "Plaintiff's

trade dress is functional." (*Id.* at Pg. ID 1039 (bold and capitalization omitted).)  In

general, "[i]n a trade dress infringement case, the determination of functionality is a

question of fact." *Mkt. Masters, Inc. v. Clinicians's Choice Dental Prods., Inc.,* 99 F.

App'x 677, 681 (6th Cir. 2004).  "[T]he person who asserts trade dress protection has

the burden of proving that the matter sought to be protected is not functional."  15

U.S.C. § 1125(a)(3).  "A product feature is functional, and cannot serve as a trademark,

if it is essential to the use or the purpose of the article or if it affects the cost or quality of

the arcticle." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 32 (2001).   In

other words, the Plaintiff must show that the disputed product feature "is merely an

ornamental, incidental, or arbitrary aspect of the device."  *Id.* at 30.

Defendants argue that "Plaintiff's trade dress is functional because the knurling   .

. . provides the user with a good gripping surface, and allows adjustments to be made

by hand, without the use of tools, even when the user is wearing gloves, the user's

hands are cold, or the user's hands and the scope itself might be wet."  (Dkt. # 67, Pg.

ID 1041-42.)  For support, Defendants point to the USPTO's April 17, 2015 denial of

Plaintiff's attempts to register its trade dress as proof positive that no issue of material

fact exists with respect to functionality.  (Dkt. # 67, Pg. ID 1039.)  The USPTO "refus[ed]

. . . registration because the applied-for mark, which consists of a three-dimensional configuration of the goods, appears to be a functional design for such goods," noting that the "scalloped ridges on the knobs and bells appears [sic] to be functional in that it [sic] allows the user a secure grip to adjust same."  (Dkt. # 69-50, Pg. ID 2975.)  While not outcome determinative, the court "is to give 'appropriate consideration and due weight' to the PTO's decision."  *Badalamenti v. Dunham's, Inc.,* 680 F. Supp. 256, 260 (E.D. Mich. 1988) (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed. Cir. 1985).   "[C]ourts can and do decide differently from the PTO examiner," but only "[o]n the basis of the evidence before the courts."  *Id.* (citing *Tyler Refrigeration v. Kysor Indus. Corp.,* 777 F.2d 687, 690 (Fed. Cir. 1985)).

Plaintiff here has not proffered sufficient evidence to meet its heavy burden, and thus no question of material fact exists.  Plaintiff fruitlessly relies on a series of conclusory opinions, its California trade dress registration, and the fact that Shi applied for a Chinese Design Patent.  Each piece of evidence will be considered in turn.

### 1. Witness Testimonies

First, Plaintiff argues that "multiple witnesses attest that the design of Leapers' trade dress was driven solely by aesthetic, not functional, considerations."  (Dkt. # 84, Pg. ID 3823 (bold, underline, and capitalization omitted).)  Specifically, Plaintiff points to the affidavits of David Ding, Leapers' co-founder and vice president, Lisheng Zheng, a Leapers' engineer, Hongtao Chen, a private businessman and close associate of David who manages Leapers' export business, and Peter Kokalis, Leapers' expert witness. Ding stated,

> While designing the Trade Dress, my sole motivation was to create a distinctive, aesthetically pleasing appearance—one that would visually stand out from the

9

> competition and signify Leapers as the source of the scope.  At no time were my design choices influenced or directed by engineering necessity, functional imperatives, or functional preferences.  Specifically, nothing about this specific Trade Dress design was intended to make scope adjustments easier to grip with one's hand.  If my design had been intended to improve grip, I would have designed it differently.

(Dkt. # 82, Pg. ID 3768.) Similarly, Zeng emphasized that "[a]lthough the scalloping design is only ornamental and does not impact scope functions, it is, however, an important foundation to establish the first impression of a scope."  (Dkt. # 86-4, Pg. ID 4043.)  Chen gave an essentially identical statement: "Although the wave design is only for appearance, not functional, it however definitely gives a distinctive first impression." (Dkt. # 86-5, Pg. ID 4052.) Finally, Plaintiff points to its expert witness, Peter Kokalis, who opined that "Leapers clearly chose its trade dress to set it apart from other companies rather than for a utilitarian purpose."  (Dkt. # 86-18, Pg. ID 4341.)

But, as the Sixth Circuit has repeatedly held, "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource,* 576 F.3d 551, 560 (6th Cir. 2009).  This is true even for expert testimony: "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The testimony proffered by Plaintiff and referenced in this section scrupulously avoids stating the obvious: the "design" all witnesses refer to is the design of a *grip.* A grip is inalterably *functional*. It exists to grasp or grip a thing more securely. Because the

scope could not function without the grip—in that it could not be adjusted as to focus—it is "essential to the use or the purpose" of the scope in question. The designer says he desired to make the grip attractive, and that may be taken as true. But the element made more attractive is not for that reason transformed into mere ornamentation; it retains its functional essence while being made more attractive.

This conclusion is actually strengthened, not diminished, by Kokalis's full affidavit in which he described the Plantiff's trade dress as

> a series of prominent, U-shaped channels separated by slightly convex ribs equidistant around the entire 360° circumference of the aluminum alloy main tubing, with both the U-shaped channels and the convex ribs, each and separately, being of the same width the entire circumference of the tubing and running parallel to the main axis of the main tube. This distinctive trade dress configuration is found . . . at the objective . . . the elevation, windage, parallax... knobs, illumination knob, . . . the magnification adjustment, . . . at the ocular, . . . and the diopter adjustment.

(Dkt. # 86-18, Pg. ID 4321.)  The court accepts the description, as it must, and notes that with the repeated use of the term "adjustment," there can be no dispute that the applications of the trade dress as described exist at locations of and participate in performing functions. That is, the knobs themselves are "functional." There is no explanation offered as to how the design with which a functional knob is formed can be separated from the functionality of the adjustment knob itself, or the sub-species of functionality consisting of a friction-inducing surface treatment with channels, ribs, checkering, cross-hatching, etc.

Kokalis avers late in his affidavit that various alternatives to the Leapers claimed trade dress "may function better than the Leapers design with regard to gripping." (*Id.* at Pg. ID 4341.)  He does not explain or elaborate except to say that the Leapers design is

11

inferior to "a significant number of alternative designs." (*Id.*) He hints, without explanation, that the Leapers "trade dress ... may very well result in mediocre to poor functionality," (*Id.* at Pg. ID 4340), and concludes that the Leapers design "could not be functional since other designs would make it easier to grip the knob," (*Id.* at Pg. ID 4341). These are nebulous and unexplained conclusions, and are not sufficient. Moreover, once functionality is established, "[t]here is no need . . . to engage . . . in speculation about other design possibilities." TrafFix Devices, Inc. 532 U.S. at 33.

Kokalis includes photographs of Leapers' and competitors' scopes showing a variety of channel-and-rib configurations applied to the noted adjustment knobs. (Dkt. # 86-18, Pg. ID 4322-40.) An examination of the Brunton 3-9x40mm, the Bushnell 3-9x40mm, the Nikon 3-90x40mm, the Alpen Kodiak 4-12x40, the Barska 6-24x42mm, the Hawke 3-9x40mm, the Mueller Optics 4.5-14x40mm, the Simons 15.-5x32mm, the BSA Edge 2-7x28, and the Sniper reveals that they share a channels-and-ribs motif. (*Id.* at Pg. ID 4325-40.) Some are more narrow, some more restrained, and some more pronounced, but all embody the essential elements described in Kokalis's description of Leapers' trade dress: channels and ribs around the circumference of the tubing or the knob in question.

The fundamental similarity of the knobs' serrations, channels, grooves, ribs, and the like provides additional weight to the court's conclusion that these knobs are designed in ways that allow them to be better gripped to perform the function of adjustment; and that remains true even if the design results in only "mediocre to poor functionality," as Kokalis seems to suggest is the user's experience with the Leapers

12

products. An element that functions is "functional" regardless of whether it functions poorly or well.

In sum, all of these "after-the-fact, self-serving testimon[ies]," have "no bearing on the classic functionality test," (Dkt. # 92, Pg. ID 4659.), and cannot create a genuine issue of material fact. One cannot strip a design of its obvious functionality simply by having interested persons say as much.

### 2. The California Trade Dress Registration

Second, Plaintiff argues that its California Trade Dress Registration is "persuasive authority that deserves respect" thus "creat[ing] a material fact question on functionality." (Dkt. # 84, Pg. ID 3824.) Plaintiff bases this argument on the premise that "California applied the same standards" as the USPTO in making its trade dress determination. (*Id.*) But the case it uses to support this proposition, *U.K. Abba Prods, v. Employers Ins. of Wausau,* No. G028347, 2002 WL 1998265 (Cal. Ct. App. Aug. 29, 2002), says no such thing. *U.K. Abba Prods.,* an insurance contract case, mentions trade dress only tangentially, and in context is unclear whether it is referring to a California trade dress registration or a federal one. Regardless, the case is unpublished and therefore not considered case law according to California Rule of Court 8.1115. Plaintiff has pointed to no other authority, statutory or judicial, to support this point, nor the general proposition that a state trade dress registration is sufficient to create an issue of material fact. Even assuming that the Secretary of State did consider all of the same criteria as the USPTO, the registration is still nothing more than another conclusory opinion, albeit by a state agency, devoid of supporting evidence, and therefore insufficient to defeat summary judgment.

13

### 3. Shi's Chinese Design Patent Application

Third, Plaintiff alleges that Shi "fil[ing] an application to register a design patent in the trade dress in China . . . suggests that Shi considers the design to be non-functional." (Dkt. # 84, Pg. ID 3826.) But whether Shi did or did not consider the scalloping to be non-functional is irrelevant. At best it would constitute conclusory opinion evidence, which, as mentioned above, is not sufficient to identify an unresolved issue of material fact. It is, in fact, a fairly pedestrian example of the *tu quoque* informal logical fallacy, i.e., the "appeal to hypocrisy" that is intended to discredit the validity of the opponent's logical argument by asserting the opponent's failure to act consistently in accordance with its stated position. Plaintiff has not identified a genuine issue of material fact with respect to the central question of whether the scalloping design was merely ornamental and non-functional. The court will grant Defendant's Motion for Summary Judgment.

### C. Trarms' and Shi's Refusal to Testify

Plaintiff nevertheless argue that "Trarms' and Shi's refusal to testify precludes summary judgment" because "there is still material discovery that Leapers is entitled to take before the summary judgment motion can be resolved." (Dkt. # 84, Pg. ID 3801). This is false. When deposed, Shi cited the Fifth Amendment and "refused to answer questions about his Chinese design patent," among other things. Trarms has subsequently refused to provide alternative witnesses to address these questions. Plaintiff reasons that "if required to meet their discovery obligations, Trarms and Shi would be forced to concede certain facts that undercut almost every factor relevant to the legal arguments raised." (*Id.* at 3802.) Specifically, Plaintiff claims that "Shi is

14

uniquely positioned to testify" about (1) whether Defendants "intentionally copied Leapers' trade dress;" (2) the "exclusivity, length, and manner of Leapers' use of the trade dress;" and (3) "the non-functionality of the trade dress." (*Id.*)

Because the court's decision hinges on a finding of functionality, not secondary meaning, evidence with respect to "intentional copying" or "exclusivity, length, and manner" are irrelevant.  Furthermore, even if Shi were to answer questions concerning "the non-functionality of the trade dress," his deposition would at most be but one more conclusory opinion which, as mentioned above, cannot defeat a motion for summary judgment.  There is nothing Shi could say that would change the fact that Plaintiff's trade dress is a functional grip, not just decoration.  As such, Plaintiff's argument is unpersuasive.

### D. Michigan and California Registrations

Finally, Defendants argue that "this court should order that Plaintiff's Michigan and California registrations for its trade dress be cancelled."  (Dkt. # 67, Pg. ID 1048.) The court disagrees.  While both California and Michigan allow a "a court of competent jurisdiction" to order a state registration cancelled if it finds that "the registration was granted improperly," M.C.L.A § 429.38; Cal. Bus. & Prof. Code § 14230, Plaintiff has not provided the court with any authority indicating the proper standard for making this determination.  The court will not wade into the unfamiliar and often conflicting waters of state law, but will deny this aspect of Defendants' Motion.

### IV. CONCLUSION

IT IS ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 67) is GRANTED.

15

IT IS FURTHER ORDERED that Defendant's request to cancel Plaintiff's state

trade dress registrations is DENIED.


s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 25, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 25, 2016, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522