**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LEAPERS, INC.,

    Plaintiff,

  v.                                                               Case No. 14-12290

SMTS, LLC d/b/a TUFF ZONE, et al.,

    Defendants.

                                                     /

**OPINION AND ORDER FINDING THE CASE TO HAVE BEEN "EXCEPTIONAL" UNDER THE LANHAM ACT, DENYING REQUEST FOR PREJUDGMENT INTEREST, AND DIRECTING SUPPLEMENTAL BRIEFING**

This is a trademark case. Plaintiff Leapers, Inc. initiated this litigation on June 10, 2014, claiming that Defendant Trarms, Inc. and several of its customers had infringed on Leapers' "common law trade dress rights" by selling rifle scopes that with the same "scalloping" grip design found on Leapers' scopes. (Dkt. # 1.) In a March 26, 2016 opinion and order, the court granted summary judgment to Defendants, holding that Leapers' grip designs were not protected because of their "obvious functionality." (Dkt. # 109, Pg. ID 4787.) The court also denied Leapers' subsequent motion for reconsideration, (Dkt. # 112), explaining that "Plaintiff's arguments largely misapprehend[ed] the court's analysis and discussion of the record and fail[ed] to address the court's reason for granting summary judgment in the first place: Plaintiff [had] proffered only a series of conclusory opinions that [were] insufficient to create a genuine dispute of material fact." (Dkt. # 119, Pg. ID 5221-22.) Leapers' appeal of the court's rulings is currently pending.

Defendants Trarms and SMTS, LLC (d/b/a "Tuff Zone") had filed counterclaims, adding Counterclaimant Chuanwen "Charlie" Shi and Counter-defendant Continental Incorporated, Inc. ("Continental"). (Dkt. # 43.) Shi is the founder and owner of Trarms, and had previously been partners in a Chinese sporting goods manufacturer with principals of Leapers. Tuff Zone is a customer of Trarms'. (*See id.*) Continental is an Indianapolis, Indiana based consulting firm that markets itself as employing "asymmetrical warfare" to protect its client's intellectual property rights from "counterfeiters and infringers who do not avail [sic] themselves to traditional enforcement processes[.]" (Dkt. # 126-3.) In describing its "asymmetrical warfare," Continental's website states:

> Our attorneys promote the creative use of state civil statutes like the Indiana Crime Victims Act [Ind. Code 34-24-3-1, ("ICVA")], which provides enhanced civil penalties for various crimes against property regardless of whether the root crime has been prosecuted. We assist state and local police agencies in enforcing state criminal statutes (i.e. forgery) as opposed to relying solely on federal law enforcement.

(*Id.*) Until her withdrawal by stipulated order on January 6, 2016, Darlene R. Seymour, a Continental employee, appeared as lead counsel for Leapers in this proceeding.

The counterclaims seek to recover under a variety of theories for Shi's public arrest at a Las Vegas trade show in January of 2014, his extradition to Evansville, Indiana, and his subsequent prosecution under an Indiana counterfeiting statute, all allegedly engineered by Leapers and Continental. (*See* Dkt. # 43.) This court stayed the counterclaims by stipulated order on February 26, 2015. (Dkt. # 57.) Judge Pigman of the Vanderburgh County Indiana Superior Court dismissed all criminal counts against Shi on November 19, 2015. (Dkt. # 104-2.) Leapers then filed a civil complaint against Trarms under the ICVA, currently pending in the Southern District of Indiana. *See*

*Leapers, Inc. v. Trarms, Inc.*, Case No. 15-01539, (the "Indiana Litigation") Dkt. # 1 (filed September 11, 2015). The Indiana Litigation is ongoing. *See* 203 F. Supp.3d 969 (S.D. Ind. 2016) (denying motion to dismiss).

Now before the court is a motion filed by Trarms requesting the court find this to have been an "exceptional case" and award Trarms reasonable attorney fees and costs under the Lanham Act, 15 U.S.C. § 1117(a). (Dkt. # 126.) In a February 28, 2017 opinion and order, the court determined that the standard set out in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), for an identically worded provision in the Patent Act, 35 U.S.C. § 285, governed this inquiry. (Dkt. # 140.) The court directed the parties to address at oral argument whether this case was exceptional under the *Octane Fitness* standard and what impact, if any, a finding on this matter would have on related proceedings before both this court and the Southern District of Indiana. (*See id.*)

The matter has been extensively briefed and a hearing was held on March 8, 2017. The court finds no reason to delay resolution of the motion, and will hold this case to have been an exceptional one under 15 U.S.C. § 1117(a) and *Octane Fitness*. However, Leapers has not had sufficient opportunity to respond to some aspects of Trarms' requested fee award. Accordingly, the court will direct additional briefing before determining the proper fee award.

## I.  STANDARD

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Either party may be awarded fees under the exceptional case provision. *See Eagles, Ltd. v. American Eagle*

*Foundation*, 356 F.3d 724, 728 (6th Cir. 2004) ("[M]ost of the cases involving 15 U.S.C. § 1117(a) have applied the 'exceptional' case analysis to prevailing plaintiffs. It is clear, however, that Congress intended to include prevailing defendants as well."). Trarms is a prevailing party, as the court granted it summary judgment on Leapers' claims.

In 2014, the Supreme Court clarified that "an exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756 (internal quotation marks omitted) (citations omitted). The Supreme Court goes on to explain that district courts should determine whether a particular case is exceptional "in the case-by-case exercise of their discretion, considering the totality of the circumstances[,]" *id.*, and to reject the clear-and-convincing standard in favor of proof by the preponderance of the evidence, *id.* at 1758.

The Supreme Court expressly rejected the existing standard, which had held that a case was exceptional only if "a district court either finds litigation-related misconduct of an independently sanctionable magnitude or determines that the litigation was both 'brought in subjective bad faith' and 'objectively baseless.'" *Id.* (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc.*, 393 F.3d, 1378, 1381 (Fed. Cir. 2005)). The Supreme Court explained that this formulation—nearly identical to the earlier standard set by the Sixth Circuit in *Eagles*—is "overly rigid" and "superimposes an inflexible framework onto statutory text that is inherently flexible." *Id.* Instead, the Supreme Court emphasized that district courts should consider the totality of the circumstances, drawing an analogy to "nonexclusive" factors considered under a similar provision in the Copyright Act such as

4

"frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756, n.6 (quoting *Fogerty v. Fantasy Inc.*, 510 U.S. 517, 534, n.19 (1994)).

## II.  DISCUSSION

While litigants generally should not be punished merely for diligently pursuing their legal rights, the Lanham Act empowers courts to use their discretion to award fees to prevailing parties in cases that stand out from the others based on weak—though not necessarily baseless—claims, apparent motive, and the need for compensation and deterrence. *Id.* Leapers brought this unmistakably weak trade dress case as part of a broader, hyper-aggressive strategy targeting its competitor across multiple forums—including through successfully pursuing public arrest and criminal prosecution in another state—at great expense to itself and Defendants. This case is highly unusual, perhaps even unique, and the court finds it to have been "exceptional" under the meaning of the Lanham Act, 15 U.S.C. § 1117(a). Accordingly, the court will grant Trarms' motion and award reasonable fees.

### A.  Substantive Strength of Litigating Position

There can be no serious debate that Leapers' unregistered trade dress case was weak. To prevail on a claim for the infringement of an unregistered product-design trade dress, a plaintiff must prove that its allegedly infringed product design (1) is nonfunctional, (2) has acquired secondary meaning, and (3) is confusingly similar to the allegedly infringing product design." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.*, 730 F.3d 494, 503 (6th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Samara*

5

*Bros.*, 529 U.S. 205, 209 (2000)). Defendants' motion for summary judgment argued that Leapers could show neither secondary meaning nor nonfunctionality. (Dkt. # 67.) The court stated that it was "inclined to find that Plaintiff has furnished enough evidence—barely—to survive summary judgment on [secondary meaning,]" but did not rule on the issue, as Leapers could not show its alleged trade dress was nonfunctional. (Dkt. # 109, Pg. ID 4781-82.) The court did not address the likelihood of confusion prong in its opinion.

### 1. Secondary Meaning

To establish secondary meaning, the evidence must show that "in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 (1982). While Leapers produced some evidence of secondary meaning, the court explained that "whether any of Plaintiff's evidence, individually or collectively, amounts to more than a scintilla is difficult to determine." (Dkt. # 109, Pg. ID 4781.) This was in part due to the "intangible and ephemeral nature of secondary meaning," (*Id.* (quoting 6 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 32:1119 (4th ed.)), but it was also because Leapers' proffered evidence was weak and conflicting.

For instance, Leapers provided sworn declarations only from professional distributors, as opposed to ultimate consumers. (*See* Dkt. # 86-17, Pg. ID 4280-300.) While this kind of testimony is admissible, the Sixth Circuit has emphasized that it is "very weak" evidence that is insufficient to create a genuine issue of material fact on its own. *See Tenneco Auto. Operating Co., Inc. v. Kingdom Auto Parts*, 410 F. App'x 841, 850 (6th Cir. 2010). Leapers' expert produced survey data, but the surveys were

6

similarly weak. For instance, in one survey only 0.5% of participants could identify Leapers as the maker of a scope by looking at it. (Dkt. # 69-14, Pg. ID 1973-89.) As the court explained in its summary judgment opinion, this is a striking result—far below the roughly 8% response rate identified as "not sufficiently probative" in *Ashland Oil, Inc. v. Olymco, Inc.*, 64 F.3d 662 (table op.), 1995 WL 499466, at *4 (6th Cir. August 21, 1995).

The court will not restate its summary judgment order in its entirety here. Nevertheless, the court notes that even had it found Plaintiffs to have proffered enough evidence to create a jury question as to secondary meaning—which it did not—Leapers would have cleared that hurdle only "barely." (Dkt. # 109, Pg. ID 4781-82.) In a vacuum, that the court indicated it was inclined to find Leapers could escape summary judgment on one of the necessary elements may cut against a finding that its case was exceptionally weak. But the court does not view this issue in a vacuum; it considers the "totality of the circumstances[.]" *Octane Fitness*, 134 S. Ct. at 1756. Leapers could not meet the second factor (nonfunctionality), and could barely survive summary judgment on the first. Viewed in this context, Leapers' proffered evidence on secondary meaning demonstrates the weakness, not the strength, of Leapers' litigating position.

### 2. Nonfunctionality

The court granted summary judgment to Defendants based on the alleged trade dress's "obvious functionality." (Dkt. # 109, Pg. ID 4787.) "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or the purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001). In other words, Leapers needed to show

the "scalloping" grip design was "merely an ornamental, incidental, or arbitrary aspect of the device." *Id.* at 30. To do this, Leapers "fruitlessly relie[d] on a series of conclusory opinions, its California trade dress registration, and the fact that Shi applied for a Chinese design patent." (Dkt. # 109, Pg. ID 4783.) None of these, the court found, could "strip [the] design of its obvious functionality[.]" (*Id.* at 4783.)

Leapers argued strenuously at the motion hearing that its evidence was based on a distinction between "de jure" and "de facto" functionality that the court declined to adopt. In their summary judgment briefing, Plaintiffs quoted *Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*, 461 F.3d 675, 685 (6th Cir. 2006), stating "the Federal Circuit maintains a helpful doctrine of de jure versus de facto functionality" before going on to quote a federal circuit case, which stated:

> Our decisions distinguish de facto functional features, which may be entitled to trademark protection, from de jure functional features, which are not. In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. De facto functionality does not necessarily defeat registrability. De jure functionality means that the product has a particular shape because it works better in this shape.

*Id.* (quoting *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 Fed. Cir. 2002)) (internal quotation marks omitted).

Leapers proffered an affidavit of David Ding, Leapers' co-founder and vice president, who stated that "while designing the Trade Dress, my sole motivation was to create a distinctive, aesthetically pleasing appearance . . . . At no time were my design choices influenced or directed by . . . functional preferences." (Dkt. # 82, Pg. ID 3768.) Other affidavits similarly averred that the design is "only ornamental and does not impact scope functions" (Dkt. # 86-4, Pg. ID 4043) or "only for appearance, not functional" (Dkt. # 86-5, Pg. ID 4052), and stated something to the effect that it "gives a

8

distinctive first impression." (*Id.*) Leapers' expert, Peter Kokalis, opined that "Leapers clearly chose its trade dress to set it apart from other companies rather than for a utilitarian purpose." (Dkt. # 86-18, Pg. ID 4341.)

The court largely rejected these as "[c]onclusory statements unadorned with supporting facts." (Dkt. # 109, Pg. ID 4784.) The court went on to explain that:

> The testimony proffered by Plaintiff and referenced in this section scrupulously avoids stating the obvious: the "design" all witnesses refer to is the design of a *grip*. A grip is inalterably *functional*. It exists to grasp or grip a thing more securely. Because the scope could not function without the grip—in that it could not be adjusted as to focus—it is "essential to the use or the purpose" of the scope in question. The designer says he desired to make the grip attractive, and that may be taken as true. But the element made more attractive is not for that reason transformed into mere ornamentation; it retains its functional essence while being made more attractive.

(*Id.* at Pg. ID 4784-85 (emphasis in original).)

A finer point should be made here—some aspect of a grip design could conceivably be nonfunctional. For instance, a particular color pattern could be divorced from the functional nature of the grip. But Leapers' "scalloping" style is inseparable from how the grip on the various adjustment knobs performs its function—which is to provide a surface to grip the knob. Even were the court to accept Leapers' distinction between de jure and de facto functionality—a distinction the Sixth Circuit once described as "helpful" but has not formally adopted—Leapers' grip design remains functional. And, as a result, Leapers' position was objectively weak.

### B. Improper Motive

Defendants' arguments regarding Leapers' alleged bad faith substantially overlap with its claims against Leapers and Continental in the related case—claims originally asserted as counterclaims in this proceeding. *See* Case No. 16-14229, Dkt. # 1. Trarms'

9

spun-off claims range from defamation and tortious interference to antitrust violations under the Sherman Act, 15 U.S.C. § 2, and alleged constitutional violations—all stemming from Shi's arrest and the other pending litigation. *Id.* The court is hesitant to make factual findings at this point that may impact claims in the related proceeding. Accordingly, the court will avoid delving into specifics regarding this outside conduct. However, the evidence submitted thus far about Leapers' conduct—in large part through its agent Continental—suggests this case is part of a continuing campaign of asymmetrical warfare intended to harass and intimidate Defendants.

A similar case is instructive, *see Farouk Systems, Inc. v. AG Global Products, LLC*, 2016 WL 6037231 (E.D. Mich. October 14, 2016). In *Farouk Systems*, the plaintiff claimed its use of a particular red and black color scheme on hair care appliances constituted protectable trade dress, and brought copyright and trademark claims against a competitor and the competitor's president, who had previously been the plaintiff's president. *Id.* The trial court granted summary judgment to the defendants, finding that the plaintiff had not used the asserted trade dress consistently and the defendants demonstrated that only 5.9% of consumers associated the red-and-black combination with a particular hair care company, and only 1.7% identified the plaintiffs as the source. In addition, the defendants "presented evidence that Farouk filed this lawsuit not to protect its red and black trade dress but, instead, to harass [the defendants] and cause them to expend significant time and resources defending against the frivolous claim." *Id.* at *4. "At the time the lawsuit was filed, Plaintiff had no information that any consumers had been confused . . . . Yet prior to filing this lawsuit, [the plaintiff] attempted to coerce a large distributor . . . not to carry [the product]. When that effort failed, [the plaintiff]

10

confronted [the defendant] at a trade show and threatened to sue him if [he] continued to market [the product.]" *Id.*

Leapers has argued repeatedly in its briefs and during oral argument that the earlier criminal prosecution is unrelated to the court's determination of exceptionality, but to the extent that this case appears to be another skirmish in a larger campaign of "asymmetrical warfare" waged by Leapers against its competitor and former business partner, a "relationship" does appear to emerge suggesting a finding of exceptionality. Far more than simply threatening baseless litigation like the plaintiff in *Farouk*, uncontested evidence in the record suggests that Leapers, through its agent, engineered serious criminal jurisdiction in a friendly venue and coordinated an embarrassing public arrest of Leapers management and customers before bringing this objectively weak case. (*See* Dkt. # 141-1.) In addition to the direct impact of the criminal case on this case—the Fifth Amendment self-incrimination issues, the compulsory counterclaims, and the requests for this court to enjoin the criminal proceedings—for the purposes of this motion, the evidence suggests that this case was part of Leapers' broader campaign against Trarms and Shi.

In particular, the court finds the Continental billing records submitted by Leapers to be especially troubling. (*See id.*) The records show that Continental billed Leapers over $26,000 for a months-long undercover sting operation; and further suggest that Continental and Leapers knew Shi lived in California but arranged for the public arrest at the Las Vegas "Shot Show," "facilitated" the "apprehension and arrest" in person, and regularly corresponded with law enforcement and prosecutors throughout the official investigation. (Dkt. # 141-1.)

11

Both in briefing and in oral argument, Leapers has emphatically denounced Trarms' argument that Leapers "lied" to this court about its degree of involvement in Shi's criminal prosecution. (*See, e.g.*, Dkt. # 134, Pg. ID 5884-86.) Despite the theatrically outraged tone employed by Leapers and its counsel, Leapers has largely confined its disagreement to quibbles about whether it, as a private entity, technically "controls" the prosecutors or can "institute" legal proceedings. (*Id.*) Leapers also contends that it lacked a "substantive opportunity . . . to describe its interaction with Indiana law enforcement" beyond its answer and motion to dismiss Trarms' counterclaims. (Dkt. # 134, Pg. ID 5887.) In that motion to dismiss, Leapers describes Continental's purchase of Trarms scopes and its report to an Evansville police detective, but omits any involvement after that initial contact, including in Shi's arrest. (Dkt. # 51, Pg. ID 684-85.) The billing records suggest that, even if Leapers did not outright "lie" to the court, it has certainly downplayed its involvement—particularly in the arrest—to a degree that can be fairly described as misleading.

Leapers has continuously sought to parse the language of *Octane Fitness* into defining as narrow and rigid a standard as possible. But the Supreme Court repeatedly emphasizes the open-ended nature of the inquiry—indeed, the problem with the old formulation was that it "superimpose[d] an inflexible framework onto statutory text that is inherently flexible." *Octane Fitness*, 134 S. Ct. at 1756. The court "must determine whether a case is 'exceptional' in the case-by-case exercise of [its] discretion, considering the totality of the circumstances." *Id.* In light of, among other things, the objective weakness of Leapers' position, the improper motive implied by the campaign of asymmetrical warfare of which this case is a single front, and the need to deter such

12

troubling uses of the judicial process in the future, the court finds this case to have been exceptional within the meaning of the Lanham Act, 15 U.S.C. § 1117(a). Accordingly, the court will award reasonable attorney fees to Defendants.

### C. Fee Award

Defendants request $720,547.01 in attorney fees and expenses for this proceeding, $94,232.94 in pre-judgment interest, and $22,890.49 in fees and expenses incurred from a related proceeding before the Trademark Trial and Appeal Board ("TTAB"), for a total of $865,048.91. (Dkt. # 135, Pg. ID 5995.) The court will deny the request for prejudgment interest and direct further briefing.

Defendants calculated their requested prejudgment interest award based on interest accruing on the entire requested attorney fee award from the date this lawsuit was filed. (Dkt. # 127, Pg. ID 5809.) The court finds the requested relief of prejudgment interest on attorney fees accruing even before the costs were incurred to be unwarranted, even under these extraordinary facts. Defendants cite a single, unreported, out-of-circuit case to support its contention that courts "can and do award prejudgment interest to defendants in trademark infringement cases." (Dkt. # 135, Pg. ID 5994 (citing *Hickory Farms, Inc. v. Snackmasters, Inc.*, 2008 U.S. Dist. LEXIS 67762, *7-8 (N.D. Ill. April 2, 2008)). The *Hickory Farms* court stated it had "not found a case in which a prevailing defendant was awarded pre-judgment interest on attorney's fees under 15 U.S.C. § 1117(a)" but concluded that it could, and would, make such an award there. *Id.* The dearth of cases awarding prejudgment interest on attorney fees proves the extraordinary nature of the remedy, even before taking into account Defendants' eyebrow-raising method of calculating interest based on costs that had not yet been

incurred. Accordingly, the court will exercise its discretion and deny Defendants' request for prejudgment interest.

Defendants did not provide an accounting for the time allegedly spent on this litigation with its initial brief, but have attached an updated declaration, including 214 pages of invoices, to its reply. (*See* Dkt. # 136.) The court will allow Leapers the opportunity to review the evidence proffered in support of Defendants' requested amount and submit supplemental briefing to the court challenging billing it believes to be unreasonable.

Defendants also request fees incurred in the TTAB proceeding. Defendants first makes this request in their reply brief (Dkt. # 135, Pg. ID 5993), though they raised the possibility in an affidavit in support of the fee award (Dkt. # 127, Pg. ID 5718-19.) Leapers has had little, if any, opportunity to respond to this request. The court will direct further briefing on this issue as well.

### III.  CONCLUSION

IT IS ORDERED that Trarms' motion for an exceptional case finding is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED in that the court finds that this case is exceptional within the meaning of the Lanham Act, 15 U.S.C. § 1117(a). Trarms' request for prejudgment interest is DENIED.

IT IS FURTHER ORDERED that Plaintiff Leapers is DIRECTED to provide a supplemental brief, no longer than six pages, addressing (1) whether Trarms is entitled to fees for the TTAB proceeding and (2) whether Trarms' requested fee award includes time spent unreasonably or time that is otherwise not compensable. Leapers is

DIRECTED to provide this supplemental briefing within **two weeks of the date of entry of this order**.

                                        s/Robert H. Cleland            /
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  July 20, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 20, 2017, by electronic and/or ordinary mail.

                                        s/Lisa Wagner                /
                                        Case Manager and Deputy Clerk
                                        (810) 292-6522